2024 IL App (1st) 230355

No. 1-23-0355

Opinion filed February 13, 2024

FIRST DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

ROBIN WILCOX, Independent Executor of the Estate of Scott Wilcox, Deceased,

      Plaintiff-Appellee,

v.

ADVOCATE CONDELL MEDICAL CENTER,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

Appeal from the
Circuit Court of
Cook County.

No. 18 L 10293

The Honorable
Lorna E. Propes,
Judge Presiding.

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Pucinski and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1      This is a medical negligence case in which a jury rendered a verdict in favor of the plaintiff, Robin Wilcox, Independent Executor of the Estate of Scott Wilcox, deceased, and against the defendant, Advocate Condell Medical Center (Advocate or Advocate Condell). On appeal, Advocate argues that it is entitled to judgment notwithstanding the verdict or, alternatively, a new trial, on the basis that the plaintiff improperly employed a theory of institutional negligence to impose direct liability on Advocate for what was, in actuality, a claim of vicarious liability for the professional negligence of the healthcare professionals who treated Scott Wilcox. Advocate further

contends that it is entitled to this same relief due to the plaintiff's failure to establish proximate cause. Finally, it argues that the trial court erred in concluding that section 2-1303(c) of the Code of Civil Procedure (735 ILCS 5/2-1303(c) (West 2022)), which allows prejudgment interest in actions for personal injury or wrongful death, is constitutional. For the reasons that follow, we affirm the judgment of the trial court.

¶ 2                                    I. BACKGROUND

¶ 3        The evidence at the trial of this case demonstrated the following. In the late 1990s, Scott Wilcox suffered an injury in a skiing accident at age 26 that rendered him paralyzed from the armpits down. To treat the muscle spasticity that resulted from his condition, a pump was implanted into his abdomen that administered the antispasmodic drug baclofen into the intrathecal space of his spinal canal via a catheter. A baclofen pump can require replacement for several reasons, but it has a limited battery life and requires surgical replacement at least every five to seven years. If a pump stops functioning in a person whose body is used to receiving intrathecal baclofen, that person is at risk of experiencing intrathecal baclofen withdrawal. As explained by multiple physicians in this case, the signs and symptoms of intrathecal baclofen withdrawal begin with increased muscle spasticity and progress through fluctuating blood pressure, increased heart rate, flushing, itchiness, confusion, fever, and respiratory rate changes, ultimately leading to cardiopulmonary collapse. The only way to stop the process of intrathecal baclofen withdrawal is to restore the intrathecal baclofen which the body is accustomed to receiving.

¶ 4        Over the years, Scott had required several pump replacements. In connection with one such instance, when his pump had stopped working in 2000, Scott had experienced symptoms of baclofen withdrawal. His symptoms on this occasion included muscle spasms, fluctuating blood pressure, and severe hallucinations. These symptoms stopped once his pump was replaced.

¶ 5 In the late afternoon of Friday, July 28, 2017, Scott saw Dr. Richard Senno, the physical medicine and rehabilitation physician who treated his muscle spasticity and managed his baclofen pump, as the pump had begun sounding an alarm the night before. After consulting with Medtronic, the pump's manufacturer, Dr. Senno concluded that Scott's pump was not working and required replacement. Although Scott was stable at that point and the situation was not an emergency, Dr. Senno wanted him to be admitted to a hospital so that he could be monitored for symptoms of baclofen withdrawal until his pump could be surgically replaced. Dr. Senno thus testified that, although Scott stated his preference to go to a more geographically convenient hospital in Highland Park, he sent him to Advocate Condell, a Level 1 trauma center at which surgery could be performed 24-hours a day, 7-days a week, if necessary.

¶ 6 Dr. Senno contacted Dr. Juan Alzate, the neurosurgeon who had performed the surgery to replace Scott's pump in 2011. Dr. Alzate's office informed Dr. Senno that Scott's surgery could take place on Monday or Tuesday of the following week, but the procedure was not immediately scheduled. Dr. Senno then called Advocate Condell and spoke to an intake coordinator, a nurse, and an emergency department physician, informing them that Scott was being sent there to be monitored for potential baclofen withdrawal symptoms pending pump-replacement surgery. Dr. Senno testified that, per the practice he always follows, he told the emergency physician about the concentration of baclofen that Scott required, which was 2000 micrograms (mcg). Dr. Senno further testified that he faxed a document to the emergency department that provided information about the type of pump and the required 2000 mcg concentration of baclofen. He testified that he also gave Scott a copy of this document to provide to the hospital.

¶ 7 Scott drove with his caretaker to Advocate Condell, and he was admitted that evening. The emergency department physician who admitted him, Dr. Joshua Hallett, documented in a note that

Scott was being admitted due to the malfunction of his baclofen pump and concern of the potential for baclofen withdrawal.[1] He noted on examination that Scott was experiencing slight spasms but otherwise appeared well. At trial, Dr. Hallett testified that he had no recollection of seeing the fax from Dr. Senno, but he acknowledged that the fax had been given a patient identification sticker by Advocate that day. He testified that, typically, when a document is faxed to the emergency department or brought in by a patient, it is scanned into the patient's medical chart and then goes with the patient.

¶ 8    Dr. Hallet admitted Scott to a regular floor, not to the intensive care unit. Scott was assigned a hospitalist, Dr. Eric Chuang, and a pain management physician, Dr. Yulia Kin-Kartsimas. Dr. Bradley Bagan, who was Dr. Alzate's partner and the neurosurgeon covering for their practice that weekend, also became involved in the case. All of these were independent staff physicians, not employees of Advocate. Scott was also cared for by several nurses that weekend who were Advocate employees. These included nurse Carol Tenant, R.N., who cared for Scott during the day on Saturday and on Sunday from 7 a.m. until approximately 5 p.m., and nurse Lauren Yonan, R.N., who cared for him overnight from 7 p.m. Sunday evening until 7 a.m. Monday.

¶ 9    In the testimony of Dr. Kin-Kartsimas, she testified that she had reviewed Scott's medical record from Friday evening and seen a nursing note documenting that " 'patient has requested IV baclofen.' " She testified that baclofen does not come in intravenous form, only in oral and intrathecal form.

¶ 10   On Saturday morning, Scott's parents, James (Jim) and Sue Ellen Wilcox, flew from Utah to Chicago to be with Scott in the hospital. Jim testified that the reason they did this was because

---

[1]None of the medical records or other exhibits used at trial are included in the record on appeal. Accordingly, our description of the contents of the medical records and trial exhibits are based on the witness testimony about those documents.

they had seen Scott's negative experience with baclofen withdrawal when his pump had broken in 2000, and they wanted to be there to help with the situation. Jim testified that, when they saw Scott early on Saturday afternoon, he appeared normal. However, Scott expressed to Jim that he was experiencing muscle tightness that was proceeding to more aggressive spasming throughout the day. At that time, no definitive day or time had yet been set for Scott's surgery. Thus, Jim generally explained in his testimony that, whenever any physician or nurse came into Scott's room, both Jim and Scott would express that Scott had experienced baclofen withdrawal before; that Scott felt he was experiencing progressively worsening symptoms of it which they knew could become severe if not addressed; and that action needed to be taken quickly for Scott to have surgery to replace his pump and restart his intrathecal baclofen. Jim testified, however, that nurse Tenant had told them that it was not possible to schedule or perform surgery on the weekend.

¶ 11    Scott was seen by multiple medical professionals on Saturday, several of whom confirmed Jim's testimony that Scott expressed anxiety about progressing baclofen withdrawal symptoms if his pump was not replaced in short order. Neurosurgeon Dr. Bagan saw and assessed Scott for the first time on Saturday morning. Dr. Bagan testified that he and Scott had a lucid conversation in which Scott's main complaint was some increased spasticity in his arms. He explained to Scott that the plan then was for the surgery to be performed sometime on Monday or Tuesday, likely by Dr. Alzate. Also on Saturday, Dr. Bagan contacted a representative from Medtronic to inform her directly that a new baclofen pump would be needed for Scott sometime in the upcoming week.

¶ 12    Hospitalist Dr. Chuang also saw Scott on Saturday afternoon. He noted Scott's spasticity, the fact that he had experienced pump failure and withdrawal symptoms in the past and was afraid of it happening again, and the fact that Scott was concerned that the pump replacement procedure was still unscheduled and might not occur for several days.

¶ 13    Pain management physician Dr. Kin-Kartsimas saw Scott that afternoon and noted he was uncomfortable due to muscle spasms. She testified also, consistent with her charting, that Scott had expressed fears that he was going to experience the symptoms of baclofen withdrawal that he had experienced previously, due to malfunction of the pump. Dr. Kin-Kartsimas testified that, as Scott's symptoms were related to the failure of his pump and of his body to receive muscle relaxant, she wanted a neurologist involved generally in his care because "it's their area of expertise, especially with such [a] complicated patient." However, Dr. Kin-Kartsimas testified that, over the course of the weekend, she never spoke about Scott's care with any neurologist, with Dr. Chuang, or with Dr. Bagan.

¶ 14    Instead, the evidence showed that Dr. Kin-Kartsimas asked nurse Tenant to relay to Dr. Chuang (as the attending hospitalist who ordered consults) that Dr. Kin-Kartsimas wanted a neurology consult for Scott. On Saturday evening, nurse Tenant sent a message to Dr. Chuang— via the hospital text-messaging system, called PerfectServe—stating that "Dr. Kin from pain management is recommending a consulting neurology. And she asked me to relay this to you, please call when you have a moment." Nurse Tenant's note from that evening states that Dr. Kin-Kartsimas was "recommending Dr. Chuang consult neurology regarding patient medication for muscle spasms." In turn, later that evening, Dr. Chuang sent a PerfectServe message to the neurologist on call, Dr. Jordan Samuels, stating that Scott had a baclofen pump that had malfunctioned and could not be fixed for a few days. Dr. Chuang's message stated, "Patient is highly anxious that he is going to withdraw and spasms worsen. Pain service is also following, but requests your input on managing his spasticity."

¶ 15    Dr. Samuels saw Scott at about 8 a.m. the next morning. He testified that he never spoke to Dr. Chuang about Scott other than via the PerfectServe text message on Saturday, and he never

spoke to Dr. Kin-Kartsimas regarding the reason why she wanted a neurology consult. He testified that his understanding was that Dr. Kin-Kartsimas wanted him to manage Scott's medication for spasticity, and he was never asked to follow Scott generally or to monitor him for signs or symptoms of intrathecal baclofen withdrawal. He noted that Scott was complaining of increased muscle spasms involving much of his body as compared to his baseline, and Dr. Samuels assessed no deficits in his mental status as of the time of his examination.

¶ 16    Dr. Kin-Kartsimas testified that she evaluated Scott at around lunchtime on Sunday, at which point he was maintaining a conversation and "everything was fine." Dr. Chuang saw Scott late on Sunday morning, at which time he assessed Scott as anxious but relatively stable. Dr. Bagan's physician assistant also saw Scott on Sunday morning and identified no neurological instability.

¶ 17    As Sunday afternoon progressed, Scott's condition worsened. His heart rate became severely elevated, and his blood pressure readings were fluctuating. Jim testified as to his observations that Scott was beginning to experience a deterioration in his mental status by forgetting things or making mistakes in speech. He was also having pronounced muscle spasms throughout his body. Nurse Tenant was caring for Scott that afternoon, until 5 p.m. The evidence showed that, over the course of the afternoon, nurse Tenant contacted Dr. Chuang multiple times about Scott's elevated heart rate and blood pressure readings. Orders were issued for Scott to receive fluids and increased Valium. Scott's family also called Dr. Senno that afternoon about their concerns, and Dr. Senno spoke to Nurse Tenant; at 4:17 p.m., she messaged Dr. Chuang to call Dr. Senno to obtain an order (as Dr. Senno could not order medication), and at 4:20 p.m., she received an order from Dr. Chuang to administer propranolol, a medication to lower blood pressure. Dr. Chuang testified that Scott's heart rate and blood pressure symptoms were what was being addressed at the time of that conversation with Dr. Senno.

¶ 18     At 5 p.m., nurse Tenant handed off care of Scott to nurse Karen Roque. Nurse Tenant explained that she did not speak to any physicians when she left the patient at 5 p.m., because she had already communicated with Dr. Chuang concerning Scott's blood pressure and heart rate, and they were simply waiting to see if his symptoms were alleviated by the medical interventions that had been ordered and administered. However, she testified that she was very concerned about him as of the time she left that day, particularly about whether the interventions were helping him.

¶ 19     The evidence indicated that, between 4 p.m. and midnight, nurses Tenant, Roque, and Yonan, who took over his care at 7 p.m., had all documented Scott as experiencing "global aphasia," meaning that he was experiencing difficulty speaking and receiving information. Neurologist Dr. Samuels testified that this kind of finding constituted "a significant change in his neurological status" compared to Scott's condition that morning. Dr. Chuang testified that he would have expected to have been notified by the nurses of this kind of clinical change in Scott's neurological status. However, no nurse ever contacted Dr. Chuang or any other physician on Sunday to notify either of them that Scott had developed any mental status changes.

¶ 20     Nurse Yonan, who cared for Scott overnight, testified that she was never made aware that the reason Scott had been admitted to Advocate Condell was to be monitored for baclofen withdrawal. She testified that she did not review nurse Tenant's progress note from earlier that evening. She could tell from the chart, however, that Scott's blood pressure and heart rate had been elevated earlier, and this continued to be the case during her shift. She testified also that he experienced increasing pain and anxiety. At 10:42 p.m., she documented that Scott was rating his pain as 10/10, and she administered Norco to him. The last time she charted Scott's vitals was at 12:55 a.m. Nurse Yonan did not communicate with any physician during her shift concerning Scott.

¶ 21     After Scott's family left on Sunday evening, Marin Kojouharov, Scott's caregiver since 2001,

stayed with him. Kojouharov testified that Scott began to experience hallucinations that evening, appearing to believe that he was talking on the phone to somebody about work and that his mother-in-law and children were in the room with him. Kojouharov testified that he called Jim about these concerns. In turn, Jim testified that upon receiving this phone call, he placed a call to Dr. Bagan's answering service at about 11:30 p.m. He left a voicemail, stating that he was extremely concerned about Scott's condition and that something needed to be done. Jim also went to Dr. Bagan's office first thing the following morning and talked to his office manager about scheduling Scott's surgery.

¶ 22　　Dr. Bagan testified that, upon receiving Jim's voicemail late Sunday night, he accessed Scott's medical records and reviewed his vital signs. He found Scott's blood pressure readings to be somewhat elevated but did not believe it was an emergency. He entered an order around 12:30 a.m. that Scott receive nothing to eat or drink after midnight, so he could undergo surgery on Monday, and he ordered a CT scan for the next morning to confirm the catheter placement. He did not know at that point whether he or Dr. Alzate would perform the procedure, but he learned the following morning that Dr. Alzate was not available to do it.

¶ 23　　When Dr. Bagan arrived at Advocate Condell on Monday morning, at around 7 to 7:30 a.m., he informed the operating room staff that Scott's pump replacement surgery needed to be added to the surgery schedule that day. He testified that he was told by the operating room staff that he could plan on doing the procedure around 1 p.m. Then, after performing another scheduled surgery, Dr. Bagan went to see Scott in his room. He testified that Scott reported feeling "goofy," which Dr. Bagan believed was consistent with a mental status change. He also noted that Scott was experiencing facial flushing, diffuse muscle spasticity, fluctuating blood pressure, and an elevated temperature of 102 degrees.

¶ 24　　At 9:31 a.m., Dr. Bagan entered an order for Scott's surgical procedure to occur. It was

scheduled as an "add on" procedure, meaning it was lower in priority than emergencies or other prescheduled procedures. He testified that a 3½ hour timeframe between scheduling and starting a surgery is "fast but not necessarily emergent," and he believed that it was "a reasonable time frame to gather all of the supplies that we needed and to get to the OR and get the surgery done."

¶ 25    The hospital records indicate that the operating room staff "took off" the order for Scott's surgery at 11:46 a.m. Dr. Bagan explained that, when an order is entered for a surgical procedure to occur, the operating room staff is responsible for gathering all surgical tools and materials that the surgeon will require to perform that procedure. He testified that surgeons provide the operating room staff with "pick lists" of all equipment needed for a particular surgery. He testified he had a pick list for baclofen pump replacement surgery on file at Advocate Condell in 2017, and one of the steps on it stated, "Obtain baclofen kit from pharmacy!!!!!!!!!!!" He stated that the 11 exclamation points meant that "that's an important step." He testified that a baclofen kit typically contained two vials of baclofen.

¶ 26    Dr. Bagan testified that, at around 1 p.m., he arrived in the preoperative holding area, where Scott and his wife were waiting for the surgery to begin. He testified that they were "ready to go, and somewhere around then is when I found out that we didn't have the equipment yet in order to do the case." He learned first that no baclofen pump was present. However, he was informed that a representative from Medtronic was on her way to Advocate Condell with the pump, and she in fact arrived with it around 1:30 p.m. Dr. Bagan testified that, at that point, he was then told that the 2000 mcg concentration of baclofen, which was required for the procedure, was not available either. He was informed that the 2000 mcg concentration of baclofen had to be obtained from another hospital, that it was expected within 1½ to 2 hours, and that the surgery could proceed when it arrived. He testified that he then left the preoperative area to attend to other patients in the

hospital but was available in the hospital to perform surgery when the baclofen arrived.

¶ 27    Sheila Grasso was the director of the pharmacy at Advocate Condell. She testified that it was not until 1 p.m. that day that the pharmacy first received a call from the operating room or preoperative staff informing the pharmacy that intrathecal baclofen was needed for a procedure that afternoon. She testified that the nurse who called her did not have information about which concentration of baclofen was needed. Grasso testified that she first contacted Dr. Bagan's office, but the physician assistant who called her back could not provide the information. She then contacted the representative from Medtronic and learned that the 2000 mcg concentration was needed. She testified that a baclofen pump replacement surgery is an infrequent procedure, and Advocate Condell's pharmacy did not stock baclofen in the 2000 mcg concentration, only in a 500 mcg concentration. Accordingly, she searched a database, which showed that the closest Advocate hospital with baclofen in the 2000 mcg concentration was Lutheran General. She contacted Lutheran General at 1:27 p.m. and arranged for a courier service to obtain it within two hours, which was the fastest window of time available to her. However, the courier service did not arrive at Advocate Condell with the baclofen until about 5 p.m. that day.

¶ 28    In the meantime, at 3:10 p.m., Scott suffered a code event and began experiencing multiorgan failure. This included extremely low blood pressure, respiratory failure, and a fever of 104 degrees. The code event lasted for 40 minutes until he was stabilized by a team of intensivists. However, Scott had suffered brain damage by that point and did not wake up. It was undisputed that this event was the result of intrathecal baclofen withdrawal.

¶ 29    When the 2000 mcg concentration of baclofen eventually arrived at the hospital, Dr. Bagan proceeded to perform the pump replacement surgery at around 5:30 p.m. He testified that it took about 30 to 40 minutes to implant the pump and get it working. There were no complications with

the pump replacement surgery itself. However, Scott never awoke following the code event and the surgery. He spent the next two weeks on life support, and he passed away following its removal on August 13, 2017.

¶ 30    On September 21, 2018, the plaintiff filed her complaint for medical negligence against Advocate. Over the course of the litigation, Dr. Chuang, Dr. Kin-Kartsimas, Dr. Samuels, Dr. Bagan, and their respective medical practice groups were also named as defendants. On June 30, 2022, an order was entered voluntarily dismissing Dr. Kin-Kartsimas, her practice group, and Dr. Samuels as defendants. On August 5, 2022, the trial court entered orders finding that settlements by Drs. Bagan and Chuang and their respective practice groups were in good faith and dismissing them as defendants.

¶ 31    The jury trial commenced on August 9, 2022, with Advocate as the only defendant. The trial lasted two weeks, during which the jury was presented with the testimony of 21 witnesses. At its conclusion, the jury was given separate issues instructions on the plaintiff's two claims against Advocate, a direct liability claim for institutional negligence and a vicarious liability claim for the negligence of nurses Tenant and Yonan. As to institutional negligence, the jury was instructed that the plaintiff was claiming that Advocate was negligent in that it (1) "[a]llowed a systems failure to exist, resulting in the delay of Scott Wilcox receiving his intrathecal baclofen," and/or (2) "[f]ailed to ensure effective communication among Scott Wilcox's healthcare providers resulting in the delay of Scott Wilcox receiving his intrathecal baclofen."

¶ 32    As to vicarious liability, the jury was instructed that the plaintiff was claiming that Advocate, acting by and through its agents, was negligent in that (1) Yonan failed to adequately monitor Scott on Sunday evening through Monday morning, (2) either Yonan or Tenant failed to adequately and timely advise neurosurgical staff and/or other physicians of Scott's worsening symptoms of

intrathecal baclofen withdrawal, (3) Yonan failed to educate herself about Scott's intrathecal baclofen withdrawal, (4) Tenant failed to communicate her concerns about Scott's intrathecal baclofen withdrawal at the end of her shift on Sunday, (5) Yonan failed to advocate for Scott in that she did not notify the neurosurgical service of his worsening condition, and/or (6) Tenant failed to advocate for Scott in that she did not advise the family that surgery could be done over the weekend. The jury was also given an instruction on sole proximate cause.

¶ 33      The jury returned a verdict in favor of the plaintiff and against Advocate on both the institutional negligence and vicarious liability claims, and it assessed damages in the sum of $42.4 million. The trial court entered judgment on the verdict on August 19, 2022. The plaintiff thereafter filed a motion to modify the judgment to add prejudgment interest allowable under section 2-1303(c) of the Code of Civil Procedure (735 ILCS 5/2-1303(c) (West 2022)) and to subtract the amounts to which Advocate was entitled to a setoff for the plaintiff's prior good-faith settlements with the other defendants.

¶ 34      On October 7, 2022, Advocate filed a posttrial motion for judgment notwithstanding the verdict or, alternatively, a new trial. It argued, in summary, that the plaintiff's institutional negligence claims were not true claims of direct corporate negligence, but rather that they were predicated on the conduct of medical professionals exercising their medical judgment. It also argued that the evidence failed to establish that Advocate was a proximate cause of Scott's injury under either theory because Dr. Bagan alone had the authority to schedule and perform the pump replacement surgery and declined to proceed on any emergency basis, despite his knowledge of Scott's condition as of Monday morning. Finally, it argued that section 2-1303(c) of the Code of Civil Procedure (*id.*) should be found unconstitutional and therefore that prejudgment interest should be disallowed in the case.

¶ 35   The posttrial motion was briefed, and the trial court conducted oral argument on January 19, 2023. At the conclusion of oral argument, the trial court stated that it had concluded that section 2-1303(c) was constitutional. It took the remaining arguments under advisement. On January 25, 2023, the trial court entered an order denying all relief requested in the posttrial motion. It thereafter modified the judgment by awarding prejudgment interest and setting off the amount of the settlements paid by Drs. Bagan and Chuang. This appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37                          A. Judgment Notwithstanding the Verdict

¶ 38   Our analysis begins with Advocate's arguments that the trial court erred by denying its posttrial motion for judgment notwithstanding the verdict. Judgment notwithstanding the verdict is properly entered only when " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand.' " *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). A motion for judgment notwithstanding the verdict presents a question of law as to whether—when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiff—there is a total failure or lack of evidence to prove a necessary element of the plaintiff's case. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37. Such a motion must be denied where there exists any evidence, together with reasonable inferences to be drawn from it, demonstrating a substantial factual dispute or where assessment of the credibility of witnesses or determination of conflicting evidence is decisive to the outcome. *Maple*, 151 Ill. 2d at 454. On review, the appellate court must avoid usurping the function of the jury and substituting its judgment on questions of fact fairly submitted, tried, and determined from evidence which did not greatly

preponderate either way. *Steed v. Rezin Orthopedics & Sports Medicine, S.C.*, 2021 IL 125150, ¶ 34. The standard of review is *de novo*. *Id.*

¶ 39                                  1. Institutional Negligence Claim

¶ 40       Advocate's first argument on appeal is that it is entitled to judgment notwithstanding the verdict because the plaintiff improperly employed a theory of institutional negligence to impose direct liability on Advocate for what was, in actuality, a claim of vicarious liability for the professional negligence of the healthcare professionals who treated Scott. In summary, its argument is that a proper claim for institutional negligence must be directed at the management or administration of a hospital; this claim was not directed at the hospital's management or administration, it contends, but rather was based only on the medical care that Scott received from his treaters. Advocate also argues that an institutional negligence claim requires proof of a hospital's prior notice that its policies and procedures were being violated and that the plaintiff failed to present such evidence in this case.

¶ 41       As noted above, the plaintiff sought to impose liability on Advocate by using two distinct legal theories, institutional negligence and vicarious liability. In actions alleging medical negligence, Illinois law provides that a hospital may be held directly liable for its own institutional negligence or vicariously liable for the professional negligence of its employees or agents. *Longnecker v. Loyola University Medical Center*, 383 Ill. App. 3d 874, 885 (2008). Where the evidence supports it, a plaintiff may seek to employ both theories as a basis for establishing a hospital's liability. See *id.* at 894-95; *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 29; accord *Groeller v. Evergreen Healthcare Center LLC*, 2015 IL App (1st) 140932, ¶¶ 26, 32.

¶ 42       Under the theory of institutional negligence, the hospital itself is the alleged tortfeasor. *Essig v. Advocate BroMenn Medical Center*, 2015 IL App (4th) 140546, ¶ 60. Illinois law recognizes a

duty on the part of hospitals "to review and supervise the treatment of their patients," and this duty is "administrative or managerial in character." *Advincula v. United Blood Services*, 176 Ill. 2d 1, 28 (1996); see *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 332 (1965); *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 291 (2000). In explaining the nature of this duty, our supreme court in *Advincula* quoted a decision by this court explaining that it involves " 'not medical expertise, but administrative expertise, to enforce rules and regulations' adopted to ensure [a] smoothly run hospital and adequate patient care." *Advincula*, 176 Ill. 2d at 28-29 (quoting *Johnson v. St. Bernard Hospital*, 79 Ill. App. 3d 709, 718 (1979)).

¶ 43       By contrast, duty under the theory of institutional negligence "does not encompass, whatsoever, a hospital's responsibility for the conduct of its agent or employee medical professionals." *Advincula*, 176 Ill. 2d at 31; *Longnecker*, 383 Ill. App. 3d at 894. Likewise, absent notice, a hospital's administration does not have a duty to ensure that the independent physicians on the hospital's staff will conform to the standard of care that those physicians owe to the patients they treat within the hospital. *Essig*, 2015 IL App (4th) 140546, ¶ 70; *Pickle v. Curns*, 106 Ill. App. 3d 734, 739 (1982).

¶ 44       In *Jones*, our supreme court explained the policy underlying this tort theory as follows:

"Underlying the tort of institutional negligence is a recognition of the comprehensive nature of hospital operations today. The hospital's expanded role in providing health care services to patients brings with it increased corporate responsibilities. As *Darling* explained: 'Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes [*sic*], as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if

necessary, by legal action.' *Darling*, 33 Ill. 2d at 332. Expounding on the point, this court later stated: '[A] modern hospital *** is an amalgam of many individuals not all of whom are licensed medical practitioners. Moreover, it is clear that at times a hospital functions far beyond the narrow sphere of medical practice.' *Greenberg v. Michael Reese Hospital*, 83 Ill. 2d 282, 293 (1980)." *Jones*, 191 Ill. 2d at 292.

¶ 45    To satisfy the duty imposed on it, a hospital must "act as would a 'reasonably careful' hospital under circumstances similar to those shown by the evidence." *Advincula*, 176 Ill. 2d at 29; see also Illinois Pattern Jury Instruction, Civil, No. 105.03.01 (2006) (hereinafter IPI Civil (2006)). In contrast to claims involving professional negligence, case law has "firmly established" that expert testimony is not always needed in an institutional negligence claim to establish the standard of care applicable to a hospital and a deviation from it. *Studt*, 2011 IL 108182, ¶¶ 21-22 (citing *Jones*, 191 Ill. 2d at 296-98; *Advincula*, 176 Ill. 2d at 33; *Greenberg*, 83 Ill. 2d at 293; *Darling*, 33 Ill. 2d 326). Instead, case law provides that "the standard of care applicable to a hospital may be proved by a number of evidentiary sources, including, but not limited to, hospital bylaws, statutes, accreditation standards, custom and community practice, but that expert testimony is not always required." *Id.* ¶ 22; accord *Jones*, 191 Ill. 2d at 298; *Advincula*, 176 Ill. 2d at 29. This rule allowing for proof of the standard of care through a variety of evidence "is appropriate given the inherent diversity in hospital administrative and managerial actions, only a portion of which involves the exercise of medical judgment." *Jones*, 191 Ill. 2d at 298 (citing *Advincula*, 176 Ill. 2d at 32-34).

¶ 46    As stated, Advocate's argument is that the institutional negligence claim advanced by the plaintiff was not proper under the standards set forth above. Advocate's argument has two related aspects. First, Advocate contends that the claim was "a vicarious liability claim in poor disguise." It contends that the claim pursued by the plaintiff did not concern a failure by the hospital in its

management or administration, but rather it was based only on the care that Scott received from his treaters. Second, Advocate argues that it cannot be held liable for institutional negligence absent evidence that it had prior notice or knowledge that its policies and procedures were being violated and that it failed to take corrective action or that the problem with its enforcement of policies or standards was more "systemic" than this one instance.

¶ 47    In evaluating Advocate's argument, we focus on (1) how the jury was instructed on the plaintiff's institutional negligence claim by the issues instruction (see IPI Civil (2006) No. 20.01), (2) the expert testimony which the plaintiff presented to establish Advocate's liability for institutional negligence, and (3) how the plaintiff's counsel argued in closing that the jury should evaluate the claim of institutional negligence.

¶ 48    *a. Issues Instruction*

¶ 49    In this case, the jury was ultimately given an issues instruction on the institutional negligence claim informing it that the plaintiff's claim was that Advocate was negligent in that it (1) "[a]llowed a systems failure to exist, resulting in the delay of Scott Wilcox receiving his intrathecal baclofen," and/or (2) "[f]ailed to ensure effective communication among Scott Wilcox's healthcare providers resulting in the delay of Scott Wilcox receiving his intrathecal baclofen." This phrasing of the issues largely mirrored the language used in the plaintiff's third amended complaint.

¶ 50    *b. Expert Testimony on Liability for Institutional Negligence*

¶ 51    The plaintiff's institutional negligence claim was primarily supported by the expert testimony of Dr. Charles Pietrafesa, a physician whose work included 17 years as chief medical officer of St. John's Hospital and Health Center in Santa Monica, California. In turn, Dr. Pietrafesa also testified as to two specific policies and procedures adopted and in force at Advocate Condell, along with

four national standards established by the Joint Commission,[2] and he expressed opinions as to how Advocate had violated its own policies and the national standards in this case.

¶ 52    As an overview, Dr. Pietrafesa expressed an opinion that a "systems failure" had occurred at Advocate Condell with respect to the care and treatment of Scott. He described a hospital as a "system," meaning "a complex series of activities and steps" in which many things occur between admission and surgery: assessments by nurses, assessments by physicians, bringing in consultants, ordering lab tests, and the like. A "system failure" occurs when "many things go wrong," despite the safeguards built in, resulting in a bad outcome. He testified that, because humans cannot be made error-free, safeguards must be put in place to prevent errors from leading to catastrophic ends. He testified that Advocate's responsibility is to adopt rules and policies to prevent errors and to train its staff on compliance with those rules. Asked to explain how the violation of a policy would be a hospital's fault, he answered, "So the hospital has a requirement to oversee the quality of care that occurs in an institution. *** [I]t's not sufficient just to write down policies and procedures, put them in a binder, and then allow individuals to perform in ways that are contrary to that."

¶ 53    The first specific policy adopted by Advocate, which Dr. Pietrafesa discussed, stated, "We respect the rights of our patients and understand that patients' concerns are fundamental and that the patient family involvement in their care is essential." He testified that this policy was violated based on the evidence showing that, despite Scott's knowledge about baclofen withdrawal and the fact that both he and his father expressed to numerous medical professionals their concerns about Scott progressing into baclofen withdrawal if his pump was not soon replaced, their concerns were

_____

[2] The Joint Commission is a national organization that accredits hospitals and develops standards directed at patient safety and quality of care. Prior to 2007, it was known as the Joint Commission on Accreditation of Healthcare Organizations.

not listened to. "So this family was very involved in trying to participate in the care of Scott in the direction which turned out to be *** correct in their assessment," he explained. He testified that the reason this policy violation was the fault of Advocate was because "this is a policy that this hospital adopted and has an obligation to implement," and the fact that "we have multiple episodes of telling multiple people" indicates to him that "no one appears to be heeding" this policy, meaning it "has not been either appropriately communicated or monitored or understood," which is the obligation of the hospital.

¶ 54    Second, Dr. Pietrafesa discussed that Advocate had adopted a policy that stated, "Report unrelieved pain and/or significant side effects to the physician." After the trial court sustained an objection concerning testimony by him that went to the nursing standard of care, Dr. Pietrafesa briefly testified in response to a hypothetical question that if Advocate creates policies intended to make health care safter, it is its responsibility to make sure those policies are followed.

¶ 55    His testimony then turned to the Joint Commission standards which, in his opinion, Advocate had violated in this case. He addressed two of these standards together. One stated, "The hospital coordinates the patient's care, treatment, and services based on the patient's needs." The second stated, "The hospital coordinates care, treatment, and services within a time frame that meets the patient's needs." He testified that the steps that take place within the hospital between the time a surgery is scheduled and the time when the procedure occurs present an example of the coordination called for by these standards. He explained in this case that Dr. Bagan had entered an order for surgery at 9:30 a.m., which was not "taken off" until 11:47 a.m., and it was not until 1 p.m. that there was any attempt to get the correct concentration of baclofen needed for the surgery. He testified that he was not critical of how any individual performed their task, but rather "[i]t's the responsibility of the conductor or the orchestrator to make sure that if you want to get

something done by 1:00, what are the steps that have to occur before." He testified he was not aware of any steps having occurred between 11:45 a.m. and when the pharmacy was asked for the baclofen at 1 p.m.

¶ 56    Dr. Pietrafesa further testified that surgeons' pick lists, which specifically state what needs to be done when the hospital is in a situation where a physician is preparing to do a pump replacement, are another requirement put in place by the hospital in response to this type of Joint Commission standard. In this case, the pick list showed 11 exclamation points on the step to order the baclofen. He stated that "even putting in place an aid to help with the standard, it was ignored." He emphasized that the second Joint Commission standard above requires that the patient's care, treatment, and services be coordinated within a time frame that meets the patient's needs, so "there's a time element to it and I think that time was very significant in this particular case."

¶ 57    The third Joint Commission standard discussed by Dr. Pietrafesa stated, "The hospital effectively manages its programs, services, sites, and departments." He explained that hospitals are complex and have many interrelated departments and that effectively managing hospital services requires the staff to manage things among departments as well. An example would be that when a physician orders a surgery, a pick list states what equipment is needed, which might involve communication with a vendor to bring in special equipment, contacting an anesthesiologist, or making sure the room is clean. Thus, "one of the key functions of the hospital is the coordination among departments." He testified that in this case, there was a lack of coordination among the departments. He cited the fact that the hospital had a pick list created "under the auspices of hospital administration that identified the importance of obtaining a baclofen kit *** prior to the surgery." Additionally, there was evidence that, on Friday, Dr. Senno had faxed the hospital and given Scott a copy of a document with information about the concentration of baclofen needed,

but neither of those documents made it to the pharmacy by 1 p.m. on the day of surgery. He testified that was a violation of the above standard.

¶ 58    The fourth Joint Commission standard discussed by Dr. Pietrafesa stated, "The management and coordination of each patient's care, treatment, and service is the responsibility of a practitioner with appropriate privileges." He testified that this rule was violated, based on the fact the physicians specifically on this case indicated that they had no prior experience with baclofen withdrawal, which is Advocate's fault because the Joint Commission holds the hospital responsible for all of these standards.

¶ 59    Not tied to any policy or standard, Dr. Pietrafesa was asked if he was critical of the Advocate Condell pharmacy for not obtaining the 2000 mcg concentration of baclofen from Lutheran General in a faster way. His answer was that the individuals involved in the operation had a specific understanding or expectation about when the baclofen would be there, and the fact that it did not arrive anywhere near that time makes him "critical that nothing was done to make it go faster."

¶ 60    Dr. Pietrfesa was asked his opinion about the "culture" that existed at Advocate Condell in late-July 2017. He answered as follows:

> "My opinion is that a culture is flawed when multiple either rules are violated or multiple people violate the same rule.
>
> So even though you put a rule in place, and they put very good rules in place, when I see records that indicate those rules weren't complied with multiple times in the course of a short period of time, that is an indicator to me of culture that that's the way they do it.
>
> For example, if the culture is a consultant is called by the nurse or through PerfectServe versus direct communication, and it happens all the time and the individuals in the care of patient think that's normal, then that to me is an indicator of the culture of

how we call consultants in a hospital."

¶ 61        Finally, Dr. Pietrafesa testified that the standard of care is to comply with the standards of the Joint Commission and the rules and regulations put forth by a hospital and the deviations from the standard of care were a cause in the delay of the surgery in this case.

¶ 62                            *c. Closing Argument on Institutional Negligence*

¶ 63        The plaintiff's counsel's closing argument on the institutional negligence claim focused on various arguments as to how a "systems failure" existed at Advocate Condell and how it failed to ensure effective communication among Scott's healthcare providers. Counsel stated in his argument that two such systems failures had occurred Friday night. The first was that the information about the required concentration of baclofen, which Dr. Senno had faxed to the hospital and sent with Scott also, did not make it to the pharmacy by the time of Scott's Monday afternoon surgery. Counsel also cited the fact that a nurse on Friday wrote that "patient says he needs IV baclofen" (instead of intrathecal baclofen), was told by the pharmacy that IV baclofen did not exist, and yet nobody followed up on this potential miscommunication.[3]

¶ 64        Turning to the events of Saturday, counsel's next cited "systems failure" was when Dr. Kin-Kartsimas ordered that a neurologist be brought in generally as a consulting physician to monitor Scott for neurological changes, but instead of communicating to Dr. Chuang directly about her recommendation, she communicated it to him through nurse Tenant. Dr. Chuang then communicated to Dr. Samuels via PerfectServe that a neurology consult was requested only for management of spasticity medication. Counsel likened this to the "children's game of telephone."

¶ 65        Counsel then discussed the events of Sunday afternoon. He pointed out that, despite three

_____

[3]The court does not find testimony in the record concerning any communication between emergency department and pharmacy personnel concerning "IV baclofen." Neither party mentions this in their briefs.

nurses charting global aphasia, no nurse communicated this to a physician. Counsel argued that the evidence suggested that when Tenant was sent home at 5 p.m., she did not share her concerns about Scott's deterioration over the course of the day with nurse Roque, who relieved her. Accordingly, Roque could not share her concerns with nurse Yonan, who assumed Scott's overnight care at 7 p.m., leaving Yonan without an understanding about what Scott's physicians knew of his condition. Counsel referred to this as a "breakdown in communication" and "system failures." Counsel then stated:

"Remember when Dr. Pietrafesa came in and talked to us? He was talking about system failures. He was talking about standards. He was talking about hospital policy.

Basically what he was saying is this: Look, if somebody is a bad apple, if somebody is not doing what they're supposed to do, shame on them. That's on them. But if you have more than one person who is not doing what they're supposed to be doing, that's a problem. And if everybody is not doing what they're supposed to be doing, that's an institutional problem. That is a cultural problem. That is what my mom used to refer to as sloppy medicine. And in this case, in this case, it ended up really making a difference."

¶ 66     Counsel proceeded to argue that the same kind of miscommunication happened on Monday. After the operating room staff became aware around 7 a.m. that Dr. Bagan wanted to perform Scott's surgery at 1 p.m. and received an order for it at 9:31 a.m., it was not "taken off" by the operating room staff until 11:46 a.m. Thus, despite the existence of Dr. Bagan's pick list that used 11 exclamation points for the step to obtain the baclofen kit from the pharmacy, the operating room staff did nothing to obtain baclofen from the pharmacy until 1 p.m. When it was then discovered that Advocate Condell did not have the required concentration and needed to order it from Lutheran General, it still did not arrive until after 5 p.m., despite the pharmacy ordering it within

a two-hour window. Counsel continued:

"That is another failure of communication and collaboration between departments.

When Dr. Pietrafesa was talking about the Joint Commission requiring that hospitals enforce these policies, that the Joint Commission require[s] that hospitals ensure that their people know the importance of communication and clear communication and, you know, actually speaking to each other occasionally, the failure to enforce those rules matters.

When you have a situation like this, like he said, within a very short period of time, talking three days, with one patient, and all these errors happened to the one guy, that is a cultural problem. That is not because of one bad apple. That's because people are practicing sloppy medicine, and the hospital is not enforcing their own policies.

That's the institutional negligence claim in this case."

¶ 67    Later in his argument, discussing the issues instruction above, counsel stated the following:

"So this is the one that talks about the hospital's failure to follow the policies and the standards and whatnot. This is what's called the institutional negligence claim. And as you see, there—there's two things cited.

I know you heard more than those from the witness stand. There were a lot of them. But you get the idea that Advocate Condell allowed a systems failure to exist, resulting in the delay of Scott Wilcox receiving his intrathecal baclofen. We've talked a little bit about this.

All those disconnects that we talked about from Friday through Sunday, all those different disconnects, they all contributed to ultimately cause the delay in getting that intrathecal baclofen. They all contributed to cause that.

But these are things that are systemic. And that's why it's an institutional claim. It's

not against any person individually for what they did. What it's about is the hospital's failure to do stuff, and that's what this is about."

¶ 68                    *d. Was This a Proper Claim of Institutional Negligence?*

¶ 69        Having carefully reviewed the record on appeal, including the full transcript of all trial proceedings, this court's conclusion is that the plaintiff appropriately employed the theory of institutional negligence to impose direct liability on the part of the hospital. The claim presented was not, as Advocate argues, a disguised claim of vicarious liability for the professional negligence of Scott's healthcare providers. Rather, the plaintiff presented sufficient evidence—in the form of expert testimony by Dr. Pietrafesa, two of Advocate's own adopted policies and procedures, and four national standards of the Joint Commission—from which the jury could determine what was required of Advocate as a reasonably careful hospital under circumstances similar to those shown by the evidence. See *Advincula*, 176 Ill. 2d at 29. Dr. Pietrafesa provided testimony from which the jury could conclude that these adopted policies or national standards had been violated in this case and that such violations were the responsibility of Advocate as an institution. These violations did not, as Advocate contends, involve healthcare professionals' medical judgments or conduct with respect to medical care and treatment. Instead, we find that the plaintiff's claim sufficiently focused on Advocate's alleged failure to comply with the administrative and managerial duty it owed as an institution to enforce and train its staff to comply with policies and national standards "adopted to ensure [a] smoothly run hospital and adequate patient care." See *id.* at 28-29 (citing *Johnson*, 79 Ill. App. 3d at 718).

¶ 70        However, we do find a degree of validity in Advocate's point that the plaintiff presented a claim that was potentially broad enough to encompass a wide range of acts or omissions by healthcare providers. For example, the claim that Advocate negligently allowed a "systems failure"

to exist is such a broad allegation of wrongdoing that it could potentially encompass any conduct shown by the evidence to have occurred. The claim that Advocate negligently failed to "ensure effective communication among Scott Wilcox's healthcare providers" is also broad enough to potentially compass any communication or absence of communication involving any healthcare provider involved in Scott's care. The Advocate policies and national standards discussed by Dr. Pietrafesa use broad language to address fairly general concepts. And some of Dr. Pietrafesa's testimony about the ways in which these policies had been violated was rather nonspecific. For its part, Advocate relies on the broadness of these allegations for its argument on appeal that the plaintiff's claim did, in fact, encompass criticisms of the medical judgments, decisions, and conduct of Scott's healthcare professionals.

¶ 71    In light of the broadness of both the plaintiff's allegations and Advocate's arguments about them, this court was particularly diligent in reviewing how the plaintiff's attorneys presented the institutional negligence claim to the jury and whether it encompassed healthcare professionals' decisions or conduct. Having done so, we do not find that the plaintiff's attorneys attempted to prove this aspect of their case through evidence of conduct implicating the standard of care owed by healthcare professionals.[4]

¶ 72    As we see it, the closest evidence on this point involves the request by Dr. Kin-Kartsimas for a general neurology consult being communicated through nurse Tenant to Dr. Chuang via PerfectServe text message to Dr. Samuels, resulting in an apparent misunderstanding about the scope of the consult. However, we find that this evidence was directed only at the method of

_____

[4]The plaintiff's disclosures under Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018) are not included in the record on appeal. Accordingly, the court lacks any detailed understanding of the exact theories of professional liability that the plaintiff had asserted against Drs. Bagan, Chuang, Kin-Kartsimas, and Samuels when they were defendants and how those theories of liability related to the claim of institutional negligence against Advocate.

communication allowed by the hospital, as opposed to criticism of the substance of what the treaters communicated or of any medical decisions by them. There was testimony by Dr. Pietrafesa, albeit quite oblique, that this was evidence of a flawed culture of rules not being enforced within the hospital. He stated,

> "[I]f the culture is a consultant is called by the nurse or through PerfectServe versus direct communication, and it happens all the time and the individuals in the care of patient think that's normal, then that to me is an indicator of the culture of how we call consultants in a hospital."

¶ 73    Also, our review of the record discloses examples at trial whereby *Advocate defended* against the plaintiff's claim with evidence and argument concerning the medical decisions of Dr. Bagan and the fact that he did not communicate a sense of urgency about Scott's procedure or the need to obtain the 2000 mcg concentration of baclofen. However, we agree with the plaintiff that this was an issue injected into the case by Advocate, and we find no evidence or argument by the plaintiff attempting to establish the institutional negligence claim through criticism of Dr. Bagan's decisions or conduct.

¶ 74    Our conclusion that the plaintiff's claim was not a disguised claim of vicarious liability is further bolstered by the fact that, despite its devoting 14 pages of its appellate brief to its argument on the propriety of the institutional negligence claim, Advocate cites only three specific examples whereby the plaintiff purportedly sought to prove an institutional negligence claim by criticizing the decisions of healthcare professionals. These examples are (1) Dr. Pietrafesa's criticism of the nurses' alleged failure to listen to the concerns of Scott and his father regarding the progression of Scott's baclofen withdrawal, (2) his criticism of the nurses for not informing Scott's treating physicians of unrelieved pain, and (3) his criticism that Scott's intrathecal baclofen should have

been obtained "faster" by the hospital's pharmacist after the surgery was scheduled.

¶ 75    As to the first two examples, we agree that overlapping evidence was presented to establish both the claim of institutional negligence and the claim of vicarious liability for nursing negligence. However, there is nothing necessarily improper about using the same evidence to support multiple theories of liability. See *Groeller*, 2015 IL App (1st) 140932, ¶ 32. And contrary to Advocate's argument, our close reading of Dr. Pietrafesa's testimony shows that he was critical only of the hospital for failing to enforce policies and procedures that it had put in place to address these issues. To the extent his testimony touched upon specific conduct by nurses, it was to provide an example that nursing policies were being disregarded by multiple people on multiple occasions; in turn, he cited this as support for his opinion that Advocate was failing to communicate or train its staff on the policies it adopted. We further note that Dr. Pietrafesa's testimony on this topic was fairly nonspecific with regard to the conduct of nurses, it was partially given in the context of a hypothetical question, and the trial court sustained an objection to testimony involving the nursing standard of care. Accordingly, these two examples cited by Advocate fail to persuade us that the plaintiff presented only a disguised claim of vicarious liability.

¶ 76    As to the third example, the facts of this case demonstrated that it was the responsibility of the hospital as an institution to procure the equipment and medication needed by a surgeon in the course of a particular surgery. Further, Dr. Pietrafesa's testimony and the Joint Commission standards provided evidence from which the jury could conclude that the standard of care included "a time element" to the hospital's coordination of care, treatment, and services, which "was very significant to this particular case." Accordingly, when Dr. Pietrafesa testified that the fact that the baclofen did not arrive anywhere near the time when it was expected made him "critical that nothing was done to make it go faster," this is reasonably interpreted as a criticism of the hospital

going to this point. This testimony does not persuade us that the plaintiff's institutional negligence claim was a disguised claim of vicarious liability.

¶ 77                                    *e. Notice of Prior Policy Violations*

¶ 78        The second aspect of Advocate's argument is that it was improperly found liable for institutional negligence, despite the plaintiff producing no evidence that Advocate knew or had reason to know that its policies or rules were being violated. Advocate argues that, where the claim is that a hospital adopted appropriate policies but did not adequately enforce them, the hospital's prior notice of the violation of its policies is a required element of proof. It makes a closely related argument concerning an absence of any proof that the alleged problems with its enforcement of its policies was "systemic" or involved cases other than this one.

¶ 79        Advocate contends that the requirement of proving that a hospital had prior notice of the violation of its policies in a case like this one is supported by *Essig*, 2015 IL App (4th) 140546, and *Reynolds v. Mennonite Hospital*, 168 Ill. App. 3d 575 (1988). We reject this argument, as Advocate is misinterpreting what these cases held concerning notice. Both cases involved application of the rule that a hospital will not be held liable for acts of malpractice committed there by staff physicians who are independent contractors; both cases recognize an exception to this rule, where liability can be imposed on the hospital if it had prior notice that the malpractice would occur. *Essig*, 2015 IL App (4th) 140546, ¶ 70; *Reynolds*, 168 Ill. App. 3d at 579. Both cases quoted *Pickle* to explain the law on this point:

> " '[W]e do not recognize the existence of a duty on the part of the hospital's administration to insure that each of its staff physicians will always perform his duty of due care to his patient. [Citation.] *** "[A] hospital will not be held liable for an act of malpractice performed by an independently retained healer, unless it had reason to know the act of

malpractice would take place ***." ' " *Essig*, 2015 IL App (4th) 140546, ¶ 70 (quoting *Pickle*, 106 Ill. App. 3d at 739, quoting *Fiorentino v. Wenger*, 227 N.E.2d 296, 299 (N.Y. 1967)).

See *Reynolds*, 168 Ill. App. 3d at 579 (same). In *Essig*, the court applied the above principle to affirm summary judgment in favor of a hospital on a claim that it was institutionally negligent in allowing a staff physician to perform certain medical procedures " 'when [the hospital], through its agents, employees, and servants knew or should have known that such procedure[s were] not clinically indicated or otherwise necessary.' " *Essig*, 2015 IL App (4th) 140546, ¶ 68. The court found that the record contained no admissible evidence to support this allegation of notice. *Id.* ¶¶ 68-71. Similarly, in *Reynolds*, the court affirmed summary judgment in favor of the defendant hospitals on the same principle—that the plaintiffs had presented no evidence that the hospitals had notice that physicians to which they had extended privileges were negligently misdiagnosing thoracic outlet syndrome. *Reynolds*, 168 Ill. App. 3d at 579-80.

¶ 80    Advocate interprets these cases too broadly when it argues that they stand for the proposition that an institutional negligence claim requires proof that a hospital must or should have known that its existing policies were being violated before liability can attach. Neither *Essig* nor *Reynolds* involved the issue of whether a hospital had prior notice that its existing policies or applicable national standards were being violated, and accordingly neither case stands for the proposition urged by Advocate.

¶ 81    Further we are aware of no case holding that, for a hospital to be held liable for institutional negligence, evidence must be produced that the hospital had prior notice that its policies or standards were being violated. The same is true of the argument that a plaintiff must show a problem with the hospital's enforcement of its policies that was "systemic" or that goes beyond

the facts of a single patient. Our review of the institutional negligence cases cited by both parties in their briefs yields no suggestion that Illinois law requires this nature of proof, and Advocate makes no persuasive argument that we should reach such a holding in this case.

¶ 82    For these reasons, we conclude that the trial court did not err in denying Advocate's posttrial motion for judgment withstanding the verdict on the grounds that the plaintiff's claim for institutional negligence was improper or insufficient as a matter of law.

¶ 83                                    2. Proximate Causation

¶ 84    Advocate's second principal argument on appeal is that it is entitled to judgment notwithstanding the verdict because the plaintiff failed to establish the element of proximate causation. According to Advocate, Dr. Bagan's testimony and the evidence of his conduct demonstrate a gap in the evidence linking Scott's injury and death either to Advocate's institutional negligence or to deviations from the standard of care by its nurses.

¶ 85    Proximate causation is a fact-specific inquiry, and determination of this issue is uniquely the province of the jury. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 107 (1997). It has two aspects, cause-in-fact and legal cause. Cause-in-fact, which is the aspect at issue in Advocate's argument, exists where there is reasonable certainty that harm would not have occurred "but for" the defendant's conduct or where that conduct was a "substantial factor" in bringing about the harm. *Steed*, 2021 IL 125150, ¶ 37. Legal cause, which is not at issue here, requires that an injury be reasonably foreseeable in connection with the defendant's conduct. *Id.* An injury may have more than one proximate cause, and a defendant is liable for its negligent conduct whether it contributed in whole or in part to the injury, provided proximate cause exists. *Shicheng Guo v. Kamal*, 2020 IL App (1st) 190090, ¶ 23.

¶ 86    As with all issues on a motion for judgment notwithstanding the verdict, we evaluate the

evidence and inferences to be reasonably drawn from it on the issue of proximate cause in the light most favorable to the plaintiff. *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 550 (2005). This court's task is not to weigh evidence or to make our own determination, but rather it is to determine whether the evidence so overwhelmingly favored Advocate that the judgment cannot stand. *Id.*; *Steed*, 2021 IL 125150, ¶ 38.

¶ 87                                          *a. Dr. Bagan's Testimony*

¶ 88        Advocate argues that Dr. Bagan's testimony exposed a fatal gap in the evidence of proximate causation on both the claims of institutional negligence and vicarious liability. Its argument centers on four points: (1) Dr. Bagan had "full control" over the timing of Scott's surgery, in that he could have performed it earlier as an emergency or urgent procedure if he believed that was warranted, (2) he testified that the surgery would not have been scheduled until Monday, even if he had received communication about Scott's condition earlier in the evening on Sunday, (3) he waited until about 9:30 a.m. on Monday to examine Scott, and after doing so, he scheduled the surgery only as an "add on," nonemergency procedure, and (4) he never conveyed any sense of urgency to anyone at the hospital about the timing of the procedure, even after he learned at around 1:30 p.m. that the 2000 mcg concentration of baclofen might not be available for two more hours. Relatedly, it cites the testimony of the plaintiff's causation expert, Dr. Alexander Merkler, that 2:45 p.m. on Monday was the time by which Scott needed his intrathecal baclofen restored to avoid the code event and permanent or irreversible brain injury.

¶ 89        The parties' arguments center in part on the following colloquy. Dr. Bagan first testified that, after receiving Jim's voicemail at 11:30 p.m. on Sunday, he reviewed Scott's chart and saw that he had heart rate changes, facial flushing, and global aphasia. He testified that these findings "certainly played a role in moving it up," referring to the then-unscheduled surgery. He then

testified:

"[MR. BARRY, PLAINTIFF'S ATTORNEY]: Is it fair to say, Doctor, that had you been informed in the early evening on Sunday, on Sunday, that Scott had developed all of those things we just talked about, your thinking would have been, we have to get the pump replaced as soon as possible?

* * *

THE WITNESS: If I would have known about those symptoms earlier in the evening on Sunday, ultimately that wouldn't have made me consider doing it in the middle of the night. I'm not sure if that's what you're asking.

BY MR. BARRY: No, no.

[THE WITNESS]: Okay.

[MR. BARRY]: But in terms of what you did after you got the call from Jim Wilcox to get the process going where ultimately you would have been able to operate on Monday, you would have started that process based on that information if you had gotten it earlier?

[THE WITNESS]: I think it would—yeah, I think it would have followed the same general template. And then I would have looked at the record and seen and perhaps started the process earlier than 11:30 or whatever it was.

[MR. BARRY]: And if it was Sunday evening, say 6 o'clock in the evening on Sunday, that you got that information and you started the process, the possibility existed that the whole thing may have been moved up, the whole process may have been moved up a few hours?

MR. HILL [(ADVOCATE'S ATTORNEY)]: Objection, form.

THE COURT: Sustained.

- 34 -

BY MR. BARRY: Q. Well, if you start the process that you started on Sunday night and instead of starting it at 12:30, we saw the orders at 12:30 a.m., if you had found out at 6 o'clock in the evening on Sunday, is it your opinion that you likely would have entered the orders then?

* * *

THE WITNESS: I think the process probably would have been the same in that—you know, ultimately that case doesn't get scheduled until the following morning, because on the weekend, especially on a Sunday evening, there's nobody there that can do all of those things.

BY MR. BARRY: Q. Okay. If you had been called by a medical professional on Sunday night with information that the patient's vital signs, including blood pressure and heart rate, had been fluctuating wildly, that he had mental status changes, that he had diffuse muscle spasms despite receiving oral baclofen, that he had developed virtually—

MR. BARRY: Mike, can we have the list?

BY MR. BARRY: Q. We had talked earlier, Doctor, that you were generally familiar with the signs and symptoms of baclofen withdrawal. This is a representative list?

[THE WITNESS]: Yes.

[MR. BARRY]: Okay. If you had been told on Sunday night that as of Sunday evening around 6:00 that Scott had increased spasticity, labile blood pressures, labile heart rates, that he had developed itching and facial flushing, he had mental status changes that had developed in the last few hours, and he would go on, as you know, to develop a fever a few hours later, would you have wanted to get that pump replaced as soon as you could?

* * *

[THE WITNESS]: It's hard to say, you know, depending on the conversation, what would have changed as far as the timing goes. Perhaps, I would have started the process of trying to plan the case earlier; but, again, ultimately, it wasn't a situation where it would be something that we would do in the middle of the night necessarily. And so, therefore, I think that, you know, timing-wise, the next morning is when I would have found out when exactly I could do the surgery.

[MR. BARRY]: Right. Although you can call the OR charge nurse at any time, 24 hours a day, seven days a week, to schedule surgery, true?

[THE WITNESS]: Yes. True.

[MR. BARRY]: And if you wanted to know what the availability was on—even on a Sunday night for what was available on Monday, you could make a call like that?

[THE WITNESS]: They would try to let us know what the availability was, yeah.

* * *

[MR. BARRY]: You'd agree that if the process [of] notifying the OR had started in the evening on Sunday, that the process of obtaining the materials to do the procedure would have started earlier than it did?

* * *

THE WITNESS: Logically, it would make sense that it could have helped speed up the process."

¶ 90                              *b. Institutional Negligence Claim*

¶ 91          As to proximate causation on the institutional negligence claim, Advocate contends that the testimony unequivocally showed that Dr. Bagan had exclusive control over all surgical decisions relating to Scott's treatment, the most significant being the timing of when the procedure occurred.

It cites his testimony above that he would not have performed it prior to Monday. It focuses on the evidence that, despite examining Scott as of 9:30 a.m. and gaining knowledge of his medical condition as of that time, he ordered the surgery only as an "add on" procedure, as opposed to an emergency or urgent procedure that would have been given higher priority in the surgical queue. Advocate points out that, even when Dr. Bagan learned around 1:30 p.m. that the hospital did not have the 2000 mcg concentration of baclofen on-site and that it might not be available for two hours, he did not convey any sense of urgency to anyone at the hospital about the timing of the procedure. Thus, Advocate argues, the hospital's pharmacy had no awareness that the medication was needed any earlier than 3:30 p.m. or of the need to take extraordinary measures to obtain it faster. Advocate further argues that Dr. Pietrafesa's testimony did not establish why the hospital was responsible for Bagan's failure to tell the pharmacist that the baclofen was needed as soon as possible or for the courier's four-hour delay in delivering it.

¶ 92    In our view, the arguments raised by Advocate on this claim involve contested issues of fact that were properly submitted to and resolved by the jury. In closing arguments, Advocate's attorney argued forcefully that Dr. Bagan bore sole responsibility for the outcome of Scott's case, for largely the reasons set forth above. The jury was also given an instruction on sole proximate cause, which was argued by counsel. The jury apparently rejected Advocate's arguments on this point, and we conclude that there was sufficient evidence to support the jury's determination.

¶ 93    Dr. Pietrafesa testified at the conclusion of his direct examination that Advocate's deviations from the standard of care were a cause of the delay in Scott's surgery, the purpose of which was to restore administration of his intrathecal baclofen. He testified that the standard of care required Advocate to comply with, *inter alia*, Joint Commission standards establishing that it is the responsibility of a hospital to coordinate a patient's care, treatment, and services based on the

patient's needs; to do so within a time frame that meets the patient's needs; and to effectively manage its programs, services, sites, and departments. He testified that Advocate violated and failed to comply with these standards. This included, according to his testimony, the fact that information about the concentration of baclofen required for Scott's upcoming surgery was given to Advocate by Dr. Senno on Friday evening but had not been communicated to the pharmacy as of 1 p.m. on Monday. It also included evidence showing that Advocate's operating room staff did not even attempt to obtain baclofen from the pharmacy until 1 p.m., which was the time shown by the evidence when Scott's surgery was scheduled to commence. This happened, despite the operating room staff having 3½ hours to prepare since Dr. Bagan entered the order for surgery at 9:31 a.m., as well as the existence of the pick list for this procedure, which used 11 exclamation points to emphasize the step directing the staff to "[o]btain baclofen kit from pharmacy!!!!!!!!!!!" According to Dr. Pietrafesa, this evidence showed a failure by Advocate to coordinate services among its departments so that surgery could occur at the time it was scheduled. In turn, Dr. Bagan also testified that, when an order is entered for a procedure such as a baclofen pump replacement surgery, it is the responsibility of Advocate's operating room staff to procure all materials and equipment needed to perform the procedure, such that everything is ready when the surgeon walks into the room. He testified that 3½ hours was a reasonable timeframe to gather the supplies needed and complete this surgery.

¶ 94        Whether to accept the above testimony was, of course, a question for the jury. But we find it sufficient to create an issue of fact as to proximate cause. The jury had evidence from which to conclude that, but for Advocate's failure to comply with the standard of care owed by a reasonably careful hospital, surgery to restore the administration of Scott's intrathecal baclofen would have occurred at or shortly after 1 p.m., notwithstanding Dr. Bagan's designation of it as an "add on"

procedure. Furthermore, any failure by Dr. Bagan to express a sense of urgency after the hospital's deviation from the standard of care prevented the surgery from occurring at its scheduled time does not negate the hospital's conduct being a proximate cause of Scott's injury and death.

¶ 95 In summary, this was not a case in which the evidence of proximate causation so overwhelmingly favored Advocate on the institutional negligence claim that no verdict in favor of the plaintiff can stand. The trial court's denial of judgment notwithstanding the verdict on this basis is therefore affirmed.

¶ 96 *c. Vicarious Liability Claim*

¶ 97 As to proximate causation on the vicarious liability claim, Advocate argues that this case is similar to *Gill v. Foster*, 157 Ill. 2d 304 (1993), and *Snelson v. Kamm*, 204 Ill. 2d 1 (2003). In both of those cases, the supreme court held that nurses' failure to communicate information to a physician was not a proximate cause of the injuries at issue, based on evidence demonstrating that the physician was aware of the information and that communication by the nurse would not have changed the course of the physician's conduct. Advocate contends that Dr. Bagan's testimony that Scott's procedure would not have been scheduled or performed until Monday, regardless of whether information about Scott's condition had been communicated to him earlier on Sunday evening, warrants the same conclusion as in *Gill* and *Snelson*.

¶ 98 In *Gill*, summary judgment was affirmed in favor of a defendant hospital, despite the failure of its nurse to communicate to a physician that the plaintiff was complaining of chest pains prior to his discharge from the hospital. *Gill*, 157 Ill. 2d at 309-10. The court reasoned that, because the evidence had shown that the physician was aware of the plaintiff's complaints of chest pain and found them insignificant, any negligence by the nurse in failing to communicate the plaintiff's complaints to the physician did not proximately cause a delay in correctly diagnosing the plaintiff's

condition. *Id.* at 311.

¶ 99      In *Snelson*, the supreme court affirmed a trial court's grant of judgment notwithstanding the verdict in a hospital's favor, where a plaintiff argued without expert testimony that his diagnosis was allegedly delayed due to nurses' failure to communicate to a physician that they had placed a catheter in him at 3 p.m. and that he continued to complain of abdominal pain after the physician left for the day at 6 p.m. *Snelson*, 204 Ill. 2d at 42-43. The court noted the physician's testimony that he had access to the nurses' notes on their care and therefore must have been aware when he examined the plaintiff that evening that the catheter had been placed at 3 p.m. *Id.* at 43. The court further found no indication in the evidence "that [the physician] would have taken a different course of action had he been informed that [the plaintiff] had some pain after [the physician] left at 6 p.m." *Id.* at 45. The court reasoned that the physician must have been aware that the plaintiff was experiencing pain and anticipated that it would continue throughout the night because he increased the dosage of pain medication that the plaintiff was receiving. *Id.* at 44. The court reasoned that, because the physician knew about the plaintiff's pain and was unconcerned beyond ordering pain medication, the nurses' conduct could not have been the proximate cause of the plaintiff's injury, even if there had been testimony that they deviated from the standard of care in failing to advise the physician of pain. *Id.*

¶ 100     In response, the plaintiff does not discuss the above cases and appears to accept Dr. Bagan's testimony that the surgery itself would not have been performed until Monday, regardless of what had been communicated to him about Scott's condition on Sunday evening. Instead, the plaintiff's proximate cause argument on the vicarious liability claim is narrower: but for the nurses' negligence in failing to communicate the severity of Scott's condition to his physicians on Sunday evening, the process of preparing for surgery, which included obtaining the correct concentration

of baclofen, would have been moved up by several hours. We note that this argument on appeal is consistent with the trial testimony of the plaintiff's nursing expert, Barbara Levin, R.N., that deviations from the standard of care by nurses Tenant and Yonan contributed to causing a delay in the procurement of the concentration of baclofen needed to replace Scott's pump.[5] (Levin testified to multiple ways in which the nurses deviated from the standard of care but, pertinent to this issue of proximate causation, all of the deviations identified essentially culminated in her testimony that they failed to effectively communicate with Scott's physicians and to advise the neurosurgical service of Scott's deteriorating condition and mental status changes that he was experiencing as of Sunday evening.)

¶ 101    In support of the argument that the nurses' failure to communicate was a proximate cause of the delay in the timely procurement of the baclofen, the plaintiff cites Dr. Bagan's testimony from the colloquy above (*supra* ¶ 89) that, depending on exactly what was communicated to him, he might have "started the process" of planning the surgery earlier on Sunday evening. The plaintiff also cites Dr. Bagan's agreement that starting the process of notifying the operating room on Sunday evening "could have helped speed up the process" of obtaining the materials to do the procedure.

¶ 102    For its part, Advocate characterizes Dr. Bagan's testimony that he might have "started the process" of planning surgery earlier as a "morsel of speculation and conjecture" that is insufficient to establish proximate cause. It cites the rule that proximate cause is not established where a causal connection is contingent, speculative, or merely possible. See *Mengelson v. Ingalls Health Ventures*, 323 Ill. App. 3d 69, 75 (2001); accord *Wiedenbeck v. Searle*, 385 Ill. App. 3d 289, 299

---

[5]This is the only testimony that the court finds in the record as to proximate causation on the nursing negligence claim, and it followed an extensive discussion about the proximate causation testimony that could be given by Levin in light of Dr. Bagan's testimony.

(2008); *Townsend v. University of Chicago Hospitals*, 318 Ill. App. 3d 406, 413 (2000).

¶ 103    We agree with Advocate that the testimony of Dr. Bagan about "starting the process" earlier is simply too speculative and contingent to serve as the evidentiary basis from which the jury could conclude that the nurses' negligence in failing to communicate Scott's condition was a proximate cause of the delay in procuring the 2000 mcg concentration of baclofen at or near the time of Scott's surgery at 1 p.m. on Monday.

¶ 104    We find the references to starting "the process" in both plaintiff's counsel's questioning and Dr. Bagan's answers to be too vague on the point that the plaintiff argues that it established. The evidence showed that the actual process followed by Dr. Bagan upon learning of Scott's condition involved entering orders at about 12:30 a.m. that Scott receive nothing to eat or drink after midnight so he could undergo surgery the next day and that he undergo a CT scan to confirm the placement of the catheter. Nothing in the evidence indicates that entering these two orders earlier in the evening would result in the pharmacy being notified that baclofen was required for surgery the following day. That is the key step of the "process" about which we find the jury was left to speculate: What would have happened earlier on Sunday night that would ultimately have caused the pharmacy to begin taking action to procure the baclofen in time to have it by or shortly after 1 p.m. on Monday? Would Dr. Bagan have contacted surgical scheduling or entered the order for surgery that evening instead of waiting until the following morning? If so, when during this process would the operating room staff likely have begun working on gathering items from the pick list, including contacting the pharmacy to obtain the baclofen? The answers to these questions are partially contingent on actions and conduct to be taken by others, and we find no evidence in the record as to what likely would have occurred. While the jury is certainly allowed to draw inferences from the evidence, we cannot accept that the jury could simply infer from this testimony

that every part of "the process" that occurred later would have occurred several hours earlier, with some things occurring in the middle of the night.

¶ 105    The plaintiff cites the testimony of pharmacy director Sheila Grasso that, if the pharmacy had been notified earlier about the need to acquire the appropriate concentration of baclofen, efforts to obtain it would have started earlier. According to the plaintiff, Grasso testified that if she had been notified in the early hours of Monday (when Dr. Bagan notified the operating room staff of the procedure around 7:30 a.m.), the baclofen likely would have arrived by 11:30 a.m. if the process followed the same template; if she had been notified by 9:35 a.m., the baclofen would have arrived around 1:30 p.m. While we take no issue with this assertion, it does not address the gap in the evidence discussed above. Grasso testified that the process within the pharmacy of obtaining a medication and getting it where it is needed within the hospital starts when the pharmacy receives an order for the medication, which can come from a phone call or medical record. If Advocate's nurses had adequately communicated Scott's condition to his physicians on Sunday evening, would Dr. Bagan's "starting the process" of planning surgery earlier that evening have included something to cause the pharmacy to receive such an order earlier than it did? Again, this is the point on which we find that the jury was required to speculate.

¶ 106    For these reasons, we conclude that, on the claim of vicarious liability only, an evidentiary gap existed as to the causal link between the nurses' deviation from the standard of care and the procurement of the 2000 mcg concentration of baclofen by or soon after the time Scott was scheduled to undergo surgery at 1 p.m. on Monday. Accordingly, we hold that the plaintiff failed to establish the proximate cause element of her vicarious liability claim.

¶ 107    However, our determination that the evidence was insufficient to establish proximate causation on the count for vicarious liability does not warrant setting aside or reversing the verdict,

due to our determination that the count for institutional negligence was legally sufficient and supported by evidence of proximate causation. Section 2-1201(d) of the Code of Civil Procedure provides:

> "If several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict; nor shall the verdict be set aside or reversed for the reason that the evidence in support of any ground is insufficient to sustain a recovery thereon, unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial." 735 ILCS 5/2-1201(d) (West 2022).

This case involved a claim for damages from Advocate arising out of a single loss, the wrongful death of Scott Wilcox, which the plaintiff pursued through two grounds of recovery. The verdict form returned by the jury indicates that it issued a single award of damages in favor of the plaintiff and against Advocate and specified that it found in favor of the plaintiff and against Advocate as to both theories. Pursuant to section 2-1201(d), the verdict is sustained based on our conclusion that a sufficient evidentiary basis existed for it on the institutional negligence count, regardless of our determination that proximate cause was not established on the count for vicarious liability. See *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 623 (2007) (under section 2-1201(d), "a general verdict can be sustained on any of several bases of liability and will not be reversed due to the impairment of one of the theories"). As such, Advocate is not entitled to judgment notwithstanding the verdict on this basis.

¶ 108                                B. New Trial

¶ 109	In the alternative to its argument that it is entitled to judgment notwithstanding the verdict, Advocate argues that this court should vacate the judgment and remand the case for a new trial because the verdict was against the manifest weight of the evidence. It further argues that it is entitled to a new trial because the institutional negligence claim was improperly premised on the conduct of treating physicians who settled prior to trial.

¶ 110	The standard of review on a motion for a new trial is different than that applied to motion for judgment notwithstanding the verdict. *Steed*, 2021 IL 125150, ¶ 44. On a motion for a new trial, the court will weigh the evidence and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Lawlor*, 2012 IL 112530, ¶ 38 (citing *Maple*, 151 Ill. 2d at 454). A verdict is against the manifest weight of the evidence only where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based on any of the evidence. *Id.* This court will not reverse a trial court's denial of a motion for new trial unless it is affirmatively shown that the trial court abused its discretion. *Id.*

¶ 111	*1. Institutional Negligence and Proximate Causation*

¶ 112	Advocate's request for a new trial is posited as alternative relief in the event that this court rejects its argument for judgment notwithstanding the verdict on the issues of institutional negligence and proximate causation. Except as discussed below, its arguments in support of a new trial are no different than its argument for judgment notwithstanding the verdict. Judging these arguments against the standards for granting a new trial, we conclude that the trial court did not abuse its discretion in denying such relief. The jury's verdict on the institutional negligence claim has support in the evidence and was not contrary to the manifest weight of the evidence.

¶ 113	*2. Settled Defendants*

¶ 114	Advocate separately argues that it is entitled to a new trial on the basis that the plaintiff's

claim of institutional negligence improperly relied upon the conduct of treating physicians who settled prior to trial, that being Dr. Bagan and Dr. Chuang. Advocate contends that the plaintiff's reliance on the conduct of these settled treaters as the basis for the institutional negligence claim deprived it of a fair trial. Advocate cites the rule that a settlement between an agent and the plaintiff extinguishes the vicarious liability of the principal. See *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 528 (1993).

¶ 115　　As discussed above, the court has carefully reviewed the full trial transcript and concluded that the plaintiff's institutional negligence claim was not premised on the conduct of Scott's treating healthcare providers, including Dr. Bagan and Dr. Chuang. This aspect of Advocate's argument suffers from the same defect identified above, in that its brief states that "large swaths of plaintiff's case was unavoidably blaming and criticizing Drs. Bagan and Chuang," yet it cites no specific examples of this occurring. It cites seven pages of Dr. Pietrafesa's testimony, yet we find no conduct by either physician mentioned on any of those pages. Accordingly, Advocate has provided no basis for us to conclude that the trial court abused its discretion in denying its posttrial motion for a new trial.

¶ 116　　　　　　　　　　　　C. Prejudgment Interest

¶ 117　　Advocate's final argument on appeal is that the section 2-1303(c) of the Code of Civil Procedure (735 ILCS 5/2-1303(c) (West 2022)), which allows prejudgment interest in actions for personal injury or wrongful death, is unconstitutional. Advocate also argues that prejudgment interest cannot be applied in this case, which accrued prior to the statute's enactment.

¶ 118　　As Advocate acknowledges, this court has recently undertaken a comprehensive evaluation of arguments that section 2-1303(c) is unconstitutional, based on multiple grounds, and held that the statute is constitutional. See *Cotton v. Coccaro*, 2023 IL App (1st) 220788, ¶¶ 40-70. The

fourth district has done the same, and it also held the statute constitutional. See *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶¶ 176-241.

¶ 119   Advocate urges this court to hold that these two cases were wrongly decided. However, it makes no attempt in its brief to discuss either of these cases or to articulate any argument as to why their reasoning was flawed. Instead, it simply urges us to adopt the arguments of the *Cotton* defendants in their petition for leave to appeal to the supreme court, which Advocate attaches in the appendix to its brief. Such incorporation by reference of a brief included in an appendix is not a proper method of presenting appellate argument, and it fails to comport with Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). See *Gruse v. Belline*, 138 Ill. App. 3d 689, 698 (1985). Beyond this, Advocate's argument appears to be nothing more than cursory recitations of the exact arguments that were rejected in *Cotton*: that the statute impairs the right to jury trial, violates due process, constitutes special legislation, violates separation of powers, was enacted in violation of the three-readings rule, and cannot be applied retroactively to cases that accrued before its effective date. Such cursory arguments on matters of constitutional law generally result in forfeiture and will not be considered by a reviewing court. *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52.

¶ 120   None of Advocate's arguments persuade us that *Cotton* was wrong in its thorough evaluation of the constitutionality of section 2-1303(c) or that that we should not follow that case's holding. Accordingly, we reject Advocate's argument that the statute is unconstitutional or should not be applied in this case.

¶ 121                                  III. CONCLUSION

¶ 122   For the reasons set forth above, the judgment of the trial court is affirmed.

¶ 123   Affirmed.

## *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st) 230355

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-L-10293; the Hon. Lorna E. Propes, Judge, presiding. |
| **Attorneys for Appellant:** | J. Timothy Eaton, Jonathan B. Amarilio, and Adam W. Decker, of Taft Stettinius & Hollister LLP, Catherine Basque Weiler, of Swanson, Martin & Bell, LLP, and Thomas R. Hill, Timothy F. Dobry, and Lauren T. Scalzo, of Smith Blake Hill LLC, all of Chicago, for appellant. |
| **Attorneys for Appellee:** | Thomas A. Demetrio, Mitchell W. Bild, and Michael D. Ditore, of Corboy & Demetrio, P.C., of Chicago, and Michael T. Reagan, of Ottawa, for appellee. |