2025 IL App (1st) 230087

No. 1-23-0087

Filed May 7, 2025

Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| BONITA JOHNSON and FIFTH THIRD BANK, as Guardians of the Estate of Anthony Harris, and BONITA JOHNSON, Individually, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) ) | |
| v. | ) ) | No. 16 L 12407 |
| ADVOCATE HEALTH AND HOSPITALS CORPORATION, d/b/a Advocate Christ Hospital and Medical Center; KATELYN R. BEDNARCZYK; CATHLEEN CARBRAY; KAREN JOHNSON, MD; RACHEL KATHERINE HARRISON, MD; JULIANNE Z. MORTON, MD; RUSMEA SALAH; and KENYA THOMAS, MD, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| (Advocate Health and Hospitals Corporation, d/b/a Advocate Christ Hospital and Medical Center, Katelyn R. Bednarczyk,  Cathleen Carbray, Rachel Katherine Harrison, MD, Julianne Z. Morton, MD, Rusmea Salah, and Kenya Thomas, MD, Defendants-Appellants.) | ) ) ) ) ) ) ) | Honorable Janet Adams Brosnahan, Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice Reyesin the judgment and opinion.

**OPINION**

¶ 1 Following a three-week trial, a jury found Advocate Health and Hospitals Corporation (Advocate) liable for the neurodevelopmental disabilities of a child delivered at the hospital in 2014. The parties presented competing theories as to the cause of the child's injuries. The plaintiffs argued that the child suffered brain damage from oxygen deprivation during the 45-minute period prior to delivery and that the hospital's staff was negligent for failing to perform an emergency Cesarean section sooner. The hospital argued that the child's injuries resulted solely from a condition that restricted his growth and development during the final weeks of pregnancy.

¶ 2 The hospital tendered a proposed jury instruction directing the jury to find for the hospital if it determined that something other than the hospital's conduct was the sole proximate cause of the child's injury. The court refused the tendered instruction, reasoning that language regarding "sole proximate cause" was purposefully omitted when the Committee on Illinois Pattern Jury Instructions revised the instructions regarding proximate cause in 2021. Instead, the court gave the revised pattern instruction, which directed the jury to find for the hospital only if they determined that the hospital's conduct was not a cause of the injury. See Illinois Pattern Jury Instructions, Civil, No. 15.01 (rev. Aug. 2021) (hereinafter IPI Civil No. 15.01). The jury returned a $20 million verdict in favor of the plaintiffs. The court awarded the plaintiffs prejudgment interest over Advocate's objection.

¶ 3 Advocate appeals, arguing that the trial court erred by refusing its tendered instruction. Alternatively, the hospital challenges the trial court's award of prejudgment interest, contending that a high-low agreement it proposed while the jury was deliberating bars prejudgment interest.

¶ 4 We find (1) IPI Civil No. 15.01 fails to provide an instruction on sole proximate cause, and (2) Advocate was entitled to a nonpattern instruction on the issue. Nonetheless, we affirm the judgment because we find Advocate did not suffer serious prejudice. We also affirm the award of

prejudgment interest, concluding that a high-low proposal is not a settlement offer as contemplated in the prejudgment interest statute (735 ILCS 5/2-1301(c) (West 2022)).

¶ 5                                                    I. BACKGROUND

¶ 6        This action was brought by Bonita Johnson[1] and Fifth Third Bank, as guardians of Anthony Harris's (AJ) estate, and Bonita individually (collectively, plaintiffs). The defendants were Advocate, obstetrician Karen Johnson, three Advocate resident physicians—Julianne Z. Morton, Rachel Katherine Harrison, and Kenya Thomas—and three Advocate nurses—Katelyn R. Bednarczyk, Cathleen Carbray, and Rusmea Salah.[2]

¶ 7        An ultrasound taken when Bonita was 20 weeks pregnant showed that AJ was developing normally. His measurements ranked in mid-range percentiles, and it was estimated that he would weigh over nine pounds at birth. A 33-week ultrasound revealed that AJ's development had slowed, and his percentiles were lower than his 20-week rankings. Bonita was seen by Dr. Johnson on October 15, 2014, for a 40-week ultrasound. AJ's growth rate had fallen even further. Some of his measurements were below the fifth percentile. But aside from his small size, AJ appeared healthy, and he exhibited normal movement.

¶ 8        AJ was small for his gestational age and Dr. Johnson suspected this was due to fetal growth restriction (FGR).[3] Dr. Johnson determined that Bonita's labor should be induced, and she was admitted to Advocate later that day.

¶ 9        Bonita was administered Pitocin to induce contractions. Although her labor progressed slowly, she maintained her wish for a vaginal delivery. After checking on Bonita around 7 a.m. the

---

[1] We will use Bonita's first name to distinguish her from Dr. Johnson.
[2] Dr. Johnson is not a party to this appeal. We refer to all other defendants as Advocate, collectively.
[3] Fetal growth restriction is also known as intrauterine growth restriction (IUGR).

next morning, Dr. Johnson went home. Bonita was monitored by the nurses and resident physicians, who reported on Bonita's labor to Dr. Johnson by telephone.

¶ 10        Beginning around 10 a.m., AJ's baseline heart rate increased. A short time later, his heart rate dropped below the normal range for several minutes before returning to an elevated rate. Over the next 3½ hours, AJ's baseline heart rate continued to rise. He also experienced sustained plunges to low rates with increasing frequency. At some point, Bonita developed a fever, which was attributed to chorioamnionitis, an infection of the amniotic fluid.

¶ 11        Dr. Johnson was incorrectly informed that AJ's heart rate tracings were normal. However, Bonita's slow progress made Dr. Johnson believe Cesarean delivery might be necessary. At 12:30 p.m., Dr. Johnson told a resident that she was driving to the hospital and instructed her to prepare Bonita for the operation. Since she encountered heavier traffic than she expected, Dr. Johnson advised the resident to contact the in-house obstetrician to perform the procedure in case she was delayed.

¶ 12        Bonita was moved to the operating room. AJ's heart rate tracings got worse and eventually indicated bradycardia—a lengthy, sustained low heart rate. An attempt to contact the in-house obstetrician was unsuccessful, as she was performing a procedure for another patient. Dr. Johnson arrived at the hospital at 1:24 p.m. and delivered AJ four minutes later at 1:28 p.m.

¶ 13        AJ was pale. He was not alert, did not respond to stimuli, and was not moving or breathing on his own. On the 10-point Apgar scale used to assess a newborn's condition, AJ scored a 1 at one minute after delivery—1 point for having a heartbeat. He was intubated to assist with breathing. His Apgar score improved to 3 at 5 minutes and 6 at 10 minutes. He did not have a fever. Blood testing revealed high levels of lactic acid and carbon dioxide and a low level of oxygen. AJ was placed in a cooling blanket to prevent brain cell deterioration. Around 24 hours after birth, AJ

began having seizures. Further blood tests revealed elevated levels of enzymes that indicate liver, kidney, and muscle damage. AJ was placed in the neonatal intensive care unit, where he remained for six weeks.

¶ 14 At birth, AJ weighed five pounds, four ounces. His head circumference was 32 centimeters, which ranked in the third overall percentile for newborns, but in the tenth percentile for African-American newborns. His length ranked in the mid-range. While in the hospital, AJ was diagnosed with neonatal encephalopathy—brain dysfunction in a newborn. Physicians also noted that FGR had occurred during his gestation.

¶ 15 At the time of trial, AJ was 7½ years old. He has exhibited several neurodevelopmental deficits. Notably, he lacks executive function, which is the cognitive ability to make decisions and determine what to do in any circumstance. AJ receives speech, occupational, and vision therapies at his school. His vocabulary is limited, and he has little ability to communicate or socialize. Every aspect of AJ's life needs supervision and assistance. He cannot be left alone and is unable to care for himself. AJ will never be able to work or live independently. He will need full-time care for life.

¶ 16 At trial, Dr. Johnson testified that had the residents and nurses kept her accurately informed about AJ's heart rate tracings, she would have ordered an expedited Cesarean section as early as 10:30 a.m. She believed the heart rate tracings indicated AJ was distressed and was not receiving sufficient oxygen.

¶ 17 Both the plaintiffs and Advocate presented expert testimony from multiple physicians. We need not discuss the portions related to whether the doctors and nurses satisfied the standard of care during Bonita's labor, as the issue is not raised on appeal. We briefly summarize the testimony pertaining to the cause of AJ's permanent disabilities.

¶ 18      The plaintiffs' experts opined that the cause of AJ's permanent disabilities was hypoxic ischemic encephalopathy (HIE)—brain damage resulting from lack of oxygen and low blood flow. AJ suffered HIE, they believe, because he was partially asphyxiated for a prolonged period during the 45 minutes immediately preceding his delivery. In their view, FGR did not account for AJ's disabilities. FGR typically has no discernable effect on neurological development, and an FGR child would not exhibit the kind of disabilities AJ has without some other causal factor. Also, records from Bonita's pregnancy showed AJ was healthy and gave no indication he would have a neurological injury. His brain was fully formed and had no structural abnormalities. An MRI taken when AJ was nine days old supported the HIE diagnosis, indicating damage to the brain in the areas furthest from blood flow, which was described as a watershed injury pattern. Cooling after birth prevented further loss but could not repair the damage. The high acidity and low oxygen shown in tests of AJ's blood and the placenta were also consistent with HIE. Likewise, the enzymes indicating damage to other organs were symptomatic of HIE, as decreased oxygen and blood flow occur throughout the whole body. Genetic screening ruled out any genetic abnormality. Plaintiffs' experts opined that if AJ had been delivered even an hour sooner, he would not have sustained injury and would not suffer from disabilities.

¶ 19      Advocate's experts disagreed. They acknowledged AJ was diagnosed with neonatal encephalopathy after his birth but do not believe this accounts for his permanent disabilities. Instead, Advocate's experts opined that AJ's disabilities resulted from FGR and the outcome would have been the same even if he had been delivered sooner. The decreased growth rate between the 33-week and 40-week ultrasounds was severe. In addition, the growth restriction appeared to affect AJ's head, which was small, more than his body, which was average size. The effects of HIE can be transient and mitigated by cooling, which was done promptly after AJ's birth. AJ generally

improved afterward. The most common permanent effect of HIE is cerebral palsy, which AJ does not have. Advocate's experts viewed AJ's MRI differently, interpreting it as revealing abnormalities consistent with FGR. Advocate's experts believed genetics most likely accounted for AJ's FGR, as the causes of most FGR cases are unknown but suspected to be genetic.

¶ 20    The parties tendered differing jury instructions regarding proximate cause. The plaintiffs tendered IPI Civil No. 15.01. In relevant part, the instruction concluded with the sentence, "However, if you decide that the defendants' conduct was not a proximate cause of the plaintiffs' injury, then your verdict should be for the defendants."

¶ 21    Advocate tendered a modified version of IPI Civil No. 15.01 with the final sentence stating, "However, if you decide that the sole proximate cause of the injury to Plaintiffs was something else or the conduct of someone else other than Defendants, then your verdict should be for the Defendants."

¶ 22    During the instructions conference, Advocate objected to the plaintiffs' tendered instruction on proximate cause and requested the court to give the modified version of IPI Civil No. 15.01 instead. The court observed that Advocate's modification relied on the withdrawn Illinois Pattern Jury Instructions, Civil, Nos. 12.04 and 12.05 (approved Dec. 8, 2011) (withdrawn August 2021) (hereinafter IPI Civil Nos. 12.04 and 12.05). For that reason, the court refused Advocate's tendered instruction and gave IPI Civil No. 15.01 unmodified.

¶ 23    While the jury was deliberating on June 24, 2022, the lead counsel for each party exchanged text messages regarding the possibility of a high-low agreement. A high-low agreement is "[a] settlement in which a defendant agrees to pay the plaintiff a minimum recovery in return for the plaintiff's agreement to accept a maximum amount regardless of the outcome of the trial." Black's Law Dictionary (12th ed. 2024). The exchange went as follows:

"[ADVOCATE'S COUNSEL]: High low 3-12, just to be memorialized.

[PLAINTIFFS' COUNSEL]: 12.5 low/40 high

[ADVOCATE'S COUNSEL]: I'll tell my peeps but I'm pessimistic.

[ADVOCATE'S COUNSEL]: OK, this is likely to be a challenge. My client is very discouraged by your response but I at least convinced them to stay in the game. Our counter is $4-15 million. Between you and me, I don't see much water remaining.

[PLAINTIFFS' COUNSEL]: 12 low/37 high

[ADVOCATE'S COUNSEL]: Well friend, it seems this isn't going to work. However, I'll see if I can get my client to give a final proposal. The current negotiation model isn't going to get us there.

[ADVOCATE'S COUNSEL]: Good news, we're cutting to the chase. Our final high low offer is $5-20 million. Additional negotiations are unnecessary at this juncture. Just let us know if Bonita and 5th/3rd accepts this offer on AJ's behalf. Thanks.

[PLAINTIFFS' COUNSEL]: 10 low/30 high

[ADVOCATE'S COUNSEL]: Mike, it looks like we have a verdict. Advocate will bump their final high low of 5-20 to 6-20 million. You can tell Sabina and judge in court whether you accept. Thanks."

¶ 24    When the parties appeared, counsel for Advocate informed the court, "We just wanted to put on the record, again, to formalize that we extended a high-low offer on behalf of Advocate and defendants of $6 million and $20 million, that was ultimately rejected by plaintiffs' counsel." Plaintiffs' counsel responded, "I was told that was final and my client rejected it."

¶ 25        The jury returned a verdict against Advocate, its three resident physicians, and its three nurses, and assessed damages for a total of $20 million. The jury found that Dr. Johnson was not liable and that she was not an apparent agent of Advocate.

¶ 26        In a motion for new trial, Advocate argued that the court erred in refusing to give the modified version of IPI Civil No. 15.01, since the unmodified version failed to instruct the jury on the sole proximate cause defense. The court denied the motion, reasoning that IPI Civil No. 15.01 is an accurate statement of law. Explaining further, the court noted that withdrawn IPI Civil Nos. 12.04 and 12.05 were confusing, causing disagreement among courts as to the meaning of "sole proximate cause," and IPI Civil No. 15.01 was revised to clarify the law.

¶ 27        The plaintiffs filed a motion requesting the court to award prejudgment interest pursuant to section 2-1303(c) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1303(c) (West 2022)). Advocate opposed the request, arguing that the statutory right to prejudgment interest enacted the previous year by Public Act 102-6, § 5 (eff. July 1, 2021) violated several provisions of the Illinois Constitution of 1970. Alternatively, Advocate contended that the plaintiffs were not entitled to prejudgment interest, since the statute bars the award of prejudgment interest when a judgment is equal to or less than the defendant's highest settlement offer, and the $20 million judgment here equaled the highest amount of Advocate's high-low offer.

¶ 28        The plaintiffs replied that the high-low offer did not constitute a settlement offer within the meaning of section 2-1303(c), contending that a high-low agreement is not a settlement since it does not terminate litigation and does not accord with the legislature's intent to encourage earlier settlement offers and discourage defendants from delaying trial of meritorious claims. Nevertheless, the plaintiffs acknowledged Advocate's $5 million settlement offer made during a

pretrial conference and requested interest on $15 million—the difference between the $20 million verdict and the $5 million offer—in accordance with the statute.

¶ 29    In a written order, the trial court rejected Advocate's constitutional challenges to section 2-1303(c). The court further found that a high-low agreement is not a settlement offer within the meaning of the statute. The court reasoned that the legislature's intent was to promote quicker resolution of meritorious personal injury and wrongful death claims. A high-low agreement, in the court's view, does not facilitate quicker resolution since it does not resolve a case before a trial or verdict. The court further observed that a defendant could subvert the statute to reduce or avoid prejudgment interest with a high offer by attaching such a low minimum that the plaintiff would not accept. The statute's silence as to good faith, the court believed, weighed toward interpreting it to prevent bad faith avoidance. The court's order indicated that if it were to treat the high-low offer as a settlement offer, it would apply the difference between the low number, $6 million, and the jury verdict. The low number, the court observed, was a guaranteed payment while the high number was a liability cap. Nonetheless, giving effect to the $5 million pretrial conference offer, the court awarded prejudgment interest on $15 million.

¶ 30    With prejudgment interest included, the total judgment entered was $20,885,205.48. Advocate filed a timely appeal.

¶ 31                                    II. ANALYSIS

¶ 32    Advocate claims that the circuit court erred in refusing to instruct the jury on the sole proximate cause theory. Before addressing that issue, however, we consider the plaintiffs' contentions that the claim is barred by judicial admission or forfeiture.

¶ 33                                    A. Judicial Admission

¶ 34       During closing argument, counsel for Advocate stated, "Well, you know, maybe we did something wrong, maybe we caused it somehow, maybe we contributed to it in a fraction of a way." The plaintiffs contend this statement is a judicial admission of causation and bars Advocate from raising any issues related to causation, including the jury instructions.

¶ 35       A judicial admission conclusively binds a party and bars a party making the admission from controverting it. *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998). To constitute a judicial admission, the statement must be deliberate, clear, unequivocal, and made by a party concerning a concrete fact within that party's knowledge. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2021 IL App (1st) 200753, ¶ 110. Statements made by an attorney in closing argument may be the basis for finding a judicial admission. *Lowe v. Kang*, 167 Ill. App. 3d 772, 777 (1988). However, courts should consider the entirety of closing arguments when assessing a statement made therein. *People v. Howery*, 178 Ill. 2d 1, 42 (1997). Ultimately, the question must be decided under the circumstances in each case. *Serrano v. Rotman*, 406 Ill. App. 3d 900, 907 (2011). The statement must be given a meaning consistent with the context in which it was found. *Id.* And it must also be considered in relation to other testimony and evidence presented. *Id.* Illinois courts have applied *de novo* and abuse of discretion standards of review when considering whether a party made a judicial admission. *North Shore Community Bank & Trust Co. v. Sheffield Wellington LLC*, 2014 IL App (1st) 123784, ¶¶ 116-119. But since this issue was not raised in the trial court and, therefore, the trial court did not exercise its discretion, we review this issue *de novo*. *Cf. Serrano*, 406 Ill. App. 3d at 907 (applying an abuse of discretion standard when reviewing a trial court's determinations as to judicial admissions).

¶ 36　　　　Viewing counsel's statement in context, we cannot conclude that it was a deliberate, clear, and unequivocal admission of causation. Rather, the remarks preceding and following the statement indicate that counsel was imploring the jury to not base its verdict on speculation. We reproduce the statement within its context:

> " 'Your verdict must not be based on speculation, prejudice, or sympathy.'
>
> In my humble opinion, those are probably the most key words in this whole pack of instructions.
>
> Can you imagine a system where you don't have this warning? Can you imagine a verdict being based on guesswork? Well, I don't know what happened to A.J. I don't know what the communications were in this case. How could we possibly know, it's seven and a half years ago? We have conflicting information. We have conflicting experts saying how, when, and why he suffered these permanent deficits, and say, I don't know, I can't make heads or tails of it. Let's go for A.J., let's give him, I don't know—I don't think I added the numbers, but it was over $60 million.
>
> Well, you know, maybe we did something wrong, maybe we caused it somehow, maybe we contributed to it in a fraction of a way. The system is wise. The system says, please, do your duty, and do not base your verdict on speculation, which is the cornerstone, I submit to plaintiff[s'] case."

¶ 37　　　　This context demonstrates that counsel first introduced the instruction regarding speculation. He then proceeded to illustrate a speculative assessment of the evidence, in his view, speaking as though he were a juror. Thus, "maybe we caused it somehow" was part of a rhetorical description of the type of speculative reasoning that would be insufficient to find Advocate liable. Counsel's discussion of prejudice and sympathy in subsequent remarks reinforces our assessment.

He used a similar rhetorical style, speaking as though he were a juror, to demonstrate reasoning based on prejudice or sympathy.

¶ 38    In addition, much of the remainder of counsel's closing argument, as well as his opening statement, testimony elicited from Advocate's experts, and cross-examination of the plaintiffs' experts, were all directed toward contesting causation. Given that the bulk of a three-week trial was centered on this pivotal issue, it is not reasonable to construe a single remark in closing as an unequivocal admission of the point. For these reasons, we find that counsel's statement was not a judicial admission that Advocate caused A.J.'s injury.

¶ 39                                  B. Forfeiture

¶ 40    Plaintiffs next argue that Advocate forfeited any claim of error related to the jury instructions by failing to more fully explain its objection to the trial court during the instruction conference.

¶ 41    To preserve a jury instruction error for review on appeal, a party must both (1) object to a proposed instruction or tender one of their own and (2) raise the issue again in a posttrial motion. *People v. Miller*, 2021 IL App (1st) 190060, ¶ 42. The posttrial motion must be sufficiently specific to apprise the trial court of the grounds of the litigant's contentions of error. *Webber v. Wight & Co.*, 368 Ill. App. 3d 1007, 1017 (2006). The motion need not be " 'voluminous,' " but must contain a " 'simple, succinct statement of the factual or legal basis' for the litigant's belief that the trial court erred." *Id.* (quoting *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 350 (1980)). In addition, the litigant must provide the reviewing court a transcript of the jury instruction conference to establish that the argument advanced on appeal was made in the trial court. *Id.* These rules are aimed at preventing a litigant from raising an issue for the first time on appeal, and at

affording the trial court an opportunity to reevaluate the merits of its earlier rulings on instruction. *Brown*, 83 Ill. 2d at 350.

¶ 42    We find that Advocate satisfied the requirements to preserve its claim of error regarding the instruction on proximate cause. Advocate tendered its own instruction to include language referring to sole proximate cause, which the trial court rejected. In addition, Advocate filed a posttrial motion setting forth its contention—in 13 numbered paragraphs over 6 pages—as to why the court's refusal to give the instruction was an error. The motion included factual and legal bases consistent with the argument Advocate makes on appeal. Accordingly, the trial court was afforded an opportunity to reevaluate its earlier ruling and Advocate is not raising the issue for the first time before us.

¶ 43    Further, the record includes a transcript of the jury instructions conference, establishing that Advocate tendered an instruction, and the trial court made a ruling as to which party's version would be given. Although Advocate did not elaborate on its basis for tendering a modified instruction, the rules regarding specificity pertain to the posttrial motion, not the instructions conference. In any event, the trial court's ruling in the conference demonstrates that the court clearly understood what it was ruling upon when the court stated it would only give the current IPI version. Nothing further was required of Advocate in the instructions conference to preserve the issue. For these reasons, we find that Advocate did not forfeit its claim of error.

¶ 44                        C. Sole Proximate Cause Instruction

¶ 45    We turn to the substance of Advocate's claim that the trial court erred by failing to instruct the jury on sole proximate cause. The plaintiffs argue that IPI Civil No. 15.01 was sufficient to instruct the jury on the issue.

¶ 46      "[L]itigants have the right to have the jury instructed on each theory supported by the evidence." *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007). "All that is required to justify the giving of an instruction is that there be some evidence in the record to justify the theory of the instruction." *Id.* Decisions as to which jury instructions will be given fall within the trial court's discretion. *Id.* Thus, a trial court's decision to grant or deny a requested jury instruction is reviewed for an abuse of discretion. *Bailey v. Mercy Hospital & Medical Center*, 2021 IL 126748, ¶ 42. "The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law." (Internal quotation marks omitted.) *Id.* Whether an instruction accurately conveyed the applicable law is a legal question we review *de novo*. *Id.*

¶ 47      Illinois courts have long recognized that

> "[a] defendant has the right not only to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, but also has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 101 (1995).

That is, a defendant may "defeat a plaintiff's claim of negligence by establishing proximate cause in the act of solely another not named in the suit." *Id.* at 92. This is known as the " 'empty chair' " or sole proximate cause defense. *Id.* It is not, however, an affirmative defense that a defendant must plead. *Id.* at 93-94. Rather, "an answer which denies that an injury was the result of or caused by the defendant's conduct is sufficient to permit the defendant *** to present evidence that the injury was the result of another cause." (Internal quotation marks omitted.) *Id.* at 94. Accordingly, raising the sole proximate cause defense does not shift the burden of proof on causation to the

defendant. *Id.* Instead, the burden to prove that the defendant proximately caused the plaintiff's injury—an essential element of negligence—remains with the plaintiff. *Id.* at 93. "[T]he sole proximate cause theory is simply one way a defendant argues that the plaintiff failed to carry its burden of proof on proximate cause—specifically, by arguing that the negligence of another person or entity, not a party to the lawsuit, was the only proximate cause of the plaintiff's injuries." *Douglas v. Arlington Park Racecourse, LLC*, 2018 IL App (1st) 162962, ¶ 36.

¶ 48    Prior to 2021, the Illinois Pattern Jury Instructions contained two instructions on the sole proximate cause theory. The first, IPI Civil No. 12.04, read:

> "More than one person may be to blame for causing an injury. If you decide that the defendant was negligent and that their negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.
>
> However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant." IPI Civil No. 12.04.

The second, IPI Civil No. 12.05, read:

> "If you decide that the defendant was negligent and that their negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury.
>
> However, if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant."  IPI Civil No. 12.05.

¶ 49    The second paragraph of IPI Civil No. 12.04 applied where there was evidence that someone other than the defendant was the sole proximate cause of the plaintiff's injury. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 519 (2000). In contrast, the second paragraph of IPI Civil No. 12.05 applied where there was evidence that something other than the defendant's conduct was the sole proximate cause of the plaintiff's injury. *Id.* Illinois courts consistently held that the second paragraphs of these instructions should be given when some evidence in the record justified the sole proximate cause theory. *Id.*; *Leonardi*, 168 Ill. 2d at 101; *Ghostanyans v. Goodwin*, 2021 IL App (1st) 192125, ¶ 80.

¶ 50    As this court observed, however, the term "sole proximate cause" is not defined in the instructions and could be confusing to a jury. *Doe v. Alexian Brothers Behavioral Health Hospital*, 2019 IL App (1st) 180955, ¶¶ 33-34. The word "sole" presented a semantic problem causing courts to grapple with whether the word means "only one." Different panels disagreed on whether the sole proximate cause instruction must be given when the defendant points to more than one party or factor, apart from the defendant's own conduct, as the exclusive cause of the plaintiff's injury.

¶ 51    In *Douglas*, 2018 IL App (1st) 162962, a divided panel of this court determined that a sole proximate cause instruction was appropriate when a defendant pointed blame at multiple nonparties. Douglas was a professional jockey who was injured after falling from his horse during a race. *Id.* ¶ 3. At a trial against the racecourse owner and operator, Douglas claimed the defendants negligently maintained the racetrack. *Id.* ¶ 8. The defendants argued, *inter alia*, that another jockey, whose horse clipped Douglas's, caused the injury or, alternatively, that the manufacturer of the synthetic racing surface was at fault. *Id.* ¶ 10. The trial court gave the long form of IPI Civil No. 12.04, which included the sole proximate cause instruction. *Id.* ¶ 16. The court also issued a special interrogatory asking the jury whether the conduct of some other person was the sole cause of

Douglas's injury. *Id.* ¶ 17. The jury returned a verdict in favor of the defendants and answered "yes" to the special interrogatory. *Id.* ¶ 18. However, the trial court ordered a new trial, reasoning that the sole proximate cause instruction and special interrogatory prejudiced Douglas since the defendants offered more than one alternative sole proximate cause and the special interrogatory did not specify whose conduct the jury was to consider. *Id.* ¶ 19.

¶ 52        This court reversed the trial court's order granting a new trial and ordered that the jury verdict be reinstated. *Id.* ¶ 86. The majority concluded that "[t]he sole proximate cause theory should be just as viable with two or more nonparty actors as it is with a single nonparty." *Id.* ¶ 37. "The critical point" of the theory, the majority reasoned, "is that the defendant's level of contribution to the plaintiff's injuries is 0%; whether the 100% of the blame falls on nonparty A, nonparty B, or both, is of no import." *Id.* The majority went on to observe that

> "[t]he paramount attribute of the word 'sole' is its exclusivity, not its number. Used in the context of 'sole proximate cause,' the point is that the group of nonparties are exclusive in the sense that their collective negligence was 100% of the plaintiff's injury, and the party-defendant's contribution to the injury was zero." *Id.* ¶ 58.

In its analysis, the majority relied on our supreme court's decisions in *Nolan v. Weil-McLain*, 233 Ill. 2d 416 (2009), and *Ready v. United/Goedecke Services, Inc.*, 238 Ill. 2d 582 (2010), which both held that the sole proximate cause theory was available when the defendant argued more than one nonparty was at fault. Based on those cases and its understanding of "sole," the majority found contrary appellate decisions such as *Clayton v. County of Cook*, 346 Ill. App. 3d 367 (2003), and *Abruzzo v. City of Park Ridge*, 2013 IL App (1st) 122360, inapposite.

¶ 53        The dissenting justice disagreed, commenting that "[a]ny competent speaker of English [citation] would recognize that sole means one." (Internal quotation marks omitted.) *Douglas*,

2018 IL App (1st) 162962, ¶ 127 (Gordon, J., dissenting). The dissent further observed that the instruction used the definite article "the" before "sole proximate cause" and referred to the conduct of *a* person—singular. *Id.* ¶ 128. In addition, the committee notes stated that the instruction should only be used when evidence tended to show the sole proximate cause of the occurrence was the conduct of *a* third person, not persons. *Id.* ¶ 129. The dissent believed *Nolan* and *Ready* did not compel the majority's conclusion, as those cases did not discuss jury instructions. *Id.* ¶ 123. Instead, the dissent would have followed *Clayton* and *Abruzzo*. *Id.* ¶ 130.

¶ 54        In a later case, another panel of this court noted the disagreement in *Douglas* and followed the dissent's view that the sole proximate cause instruction cannot apply when the defense points to more than one nonparty. *Doe*, 2019 IL App (1st) 180955, ¶¶ 33-34. The court also pointed out that confusion could arise since "sole proximate cause" is not defined and the IPI definition of "proximate cause" specifically allows for more than one cause. *Id.* ¶ 35.

¶ 55        Subsequently, in 2021, the Illinois Supreme Court Committee on Jury Instructions in Civil Cases (Committee) withdrew both IPI Civil Nos. 12.04 and 12.05. At the same time, the Committee revised IPI Civil No. 15.01 to, according to the Committee's Comment, "harmoniz[e] the proximate cause instructions formerly found in IPI 12.04, 12.05, and 15.01 into one proximate cause instruction to avoid unnecessary confusion and consternation." IPI Civil No. 15.01 Committee Comment (rev. Oct. 2021). The first paragraph of IPI Civil No. 15.01 remained the same. It reads:

> "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury.]" IPI Civil No. 15.01.

The revision added a second paragraph, which we will label sentence one and sentence two for clarity in our analysis. Sentence one reads: "If you decide that the defendant was negligent and that their negligence was a proximate cause of injury to the plaintiff, it is not a defense that something or someone else may also have been a cause of the injury."[4] *Id.* Sentence two reads: "However, if you decide that the defendant's conduct was not a proximate cause of the plaintiff's injury, then your verdict should be for the defendant." *Id.* The Committee Comment states:

> "The second paragraph in this instruction merges the concepts previously conveyed in IPI 12.04 and 12.05 and combines those concepts into one proximate cause instruction because 'Nomenclature aside, the sole proximate cause theory is simply one way a defendant argues that the plaintiff failed to carry its burden of proof on proximate cause—specifically, by arguing that the negligence of another person or entity, not a party to the lawsuit, was the only proximate cause of the plaintiff's injuries.' " IPI Civil No. 15.01, Committee Comment (rev. Oct. 2021) (quoting *Douglas*, 2018 IL App (1st) 162962, ¶ 36 (majority opinion)).

¶ 56   Likewise, we observe that sentence one expresses the concept contained in the first paragraphs of IPI Civil Nos. 12.04 and 12.05—namely, that a defendant cannot escape liability merely because some other person or thing is partially to blame for the plaintiff's injury. Sentence two, however, departs from the language used in the second paragraphs of IPI Civil Nos. 12.04 and 12.05, which Illinois courts had recognized as stating the sole proximate cause defense. The withdrawn paragraphs instructed jurors to find for the defendant if they decided that the sole proximate cause of the plaintiff's injury was someone or something other than the defendant's conduct. By contrast, sentence two in the revised instruction instructs jurors to find for the

---

[4]Brackets removed for clarity.

defendant if they "decide that the defendant's conduct was not a proximate cause of the plaintiff's injury." IPI Civil No. 15.01.

¶ 57    The word "sole" no longer appears, presumably to avoid the semantic problem of whether "sole" means "only one," as highlighted in *Douglas*. Thus, the instruction would be applicable regardless of whether the defendant points to a single or multiple alternate proximate causes and would also apply when the defendant simply argues that their conduct did not cause the plaintiff's injury, without offering an alternate cause. Although the revised instruction broadly covers all these scenarios, the distinct idea of the sole proximate cause defense is not explicitly stated.

¶ 58    Our supreme court stated that:

> "[a] defendant has the right *not only* to rebut evidence tending to show that defendant's acts are negligent and the proximate cause of claimed injuries, *but also* has the right to endeavor to establish by competent evidence that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries." (Emphases added.) *Leonardi*, 168 Ill. 2d at 101.

Thus, in our supreme court's formulation, the defense that a third party or other causative factor is solely to blame for the plaintiff's injury is a distinct and additional way to argue that the defendant's conduct was not the proximate cause of the plaintiff's injury. That the defendant's conduct did not cause the plaintiff's injury rebuts an element of negligence. This was introduced with the words "not only" in the quote from *Leonardi*. But the sole proximate cause defense rebuts that element for a particular reason—because someone or something else is wholly to blame for the plaintiff's injury. This concept was introduced by the words "but also" in *Leonardi*.

¶ 59    Sentence two in revised IPI Civil No. 15.01 only states the first, general defense from the *Leonardi* quote. It is also a corollary to the basic negligence instruction that the plaintiff has the

burden to prove that the defendant proximately caused the plaintiff's injury. Although the sole proximate cause defense is "simply one way a defendant argues that the plaintiff failed to carry its burden of proof on proximate cause" (*Douglas*, 2018 IL App (1st) 162962, ¶ 36), *Leonardi* makes clear that, when supported by the evidence, a defendant is entitled to an explicit instruction "that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries." *Leonardi*, 168 Ill. 2d at 101. Revised IPI Civil No. 15.01 fails to provide such an instruction. Accordingly, we find that, although sentence two of IPI Civil No. 15.01 is an accurate statement of law on proximate cause in general, it does not state the law regarding the sole proximate cause defense with the specificity *Leonardi* requires.

¶ 60        To reiterate, a party is entitled to have the jury instructed on any theory supported by the evidence. *Heastie*, 226 Ill. 2d at 543. When the IPI do not contain an applicable instruction, a non-IPI instruction may be used. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 14; Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013). Here, Advocate presented evidence by way of expert testimony that AJ's injuries were caused solely by FGR. Therefore, Advocate was entitled to an instruction on sole proximate cause. Revised IPI Civil No. 15.01 did not suffice, as it does not state the sole proximate cause defense. Thus, the court erred by refusing to give the modified instruction.

¶ 61                              D. Single vs. Multiple Causes

¶ 62        Plaintiffs argue that Advocate was not entitled to a sole proximate cause instruction since they introduced evidence of multiple, alternate causes for AJ's injuries, which included FGR, genetics, placental insufficiency, microcephaly, and infection. In so arguing, plaintiffs urge us to interpret "sole" as meaning only one, as was done by the court in *Doe* and the dissent in *Douglas*.

¶ 63        We need not resolve whether a sole proximate cause instruction is available when a defendant points to more than one alternate cause. In our review of the record, Advocate argued

only that AJ's injuries resulted from FGR. As explained by the physician witnesses, FGR itself could result from several different causes and manifest different symptoms. The other factors were discussed in relation to FGR, either as a cause or symptom. Thus, Advocate pointed to FGR as a single, multifaceted cause of AJ's injuries.

¶ 64                                                    E. Prejudice

¶ 65        Advocate contends the trial court's refusal to give its modified instruction deprived it of a fair trial. Advocate reasons that since it presented evidence tending to show FGR was the sole proximate cause of AJ's injuries, the trial court's refusal to give a sole proximate cause instruction was reversible error. Erroneous or incomplete instructions, however, do not necessarily require reversal of a judgment. *Studt*, 2011 IL 108182, ¶ 34; *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002). Indeed, the standard for reversing a judgment for failure to give a requested instruction is high. *Bailey*, 2021 IL 126748, ¶ 41. We will only reverse if the error resulted in " 'serious prejudice' " to the appellant's right to a fair trial. *Studt*, 2011 IL 108182, ¶ 28 (quoting *Heastie*, 226 Ill. 2d at 543). Serious prejudice occurs when the trial court's faulty instructions clearly misled the jury. *Schultz*, 201 Ill. 2d at 274.

¶ 66        To assess whether Advocate was seriously prejudiced, we take guidance from our supreme court's opinion in *Schultz*. There, regarding a Federal Employers' Liability Act (FELA) claim (45 U.S.C. § 51 *et seq.* (1994)), the jury was instructed it could not deny or limit damages resulting from an injury simply because the plaintiff had a preexisting condition. *Schultz*, 201 Ill. 2d at 279-80. The instruction was legally inaccurate because FELA only allowed a plaintiff to recover damages for the aggravation of a preexisting condition. *Id.* at 280. The instruction was misleading

since it appeared to instruct the jury that damages could not be limited in any way if the injury resulted from the aggravation of a preexisting condition. *Id.*

¶ 67    Yet, despite the improper instruction, the court found it was not reversible error, as the record failed to support that the jury was clearly misled. *Id.* at 281. The court noted a separate instruction properly focused the assessment of damages on those that "resulted from the negligence of the defendant." (Emphasis and internal quotation marks omitted.) *Id.* In addition, the defendant failed to offer a verdict form that would have required the jury to specify the amount of damages awarded for aggravation of the plaintiff's preexisting condition. *Id.* Further, defense counsel was permitted to discuss the plaintiff's preexisting condition at length during closing argument and argue that the plaintiff's injury would have resulted even if the accident had not occurred. *Id.* at 281-82.

¶ 68    The record in this case shares similar features to *Schultz*. Although the jury was not given an explicit instruction on sole proximate cause, it was instructed that the plaintiffs' had the burden to prove Advocate's acts proximately caused AJ's injury. Furthermore, it instructed that if the jury decided that Advocate's conduct was not a proximate cause of the injury, they should return a verdict for Advocate. These were accurate statements of law. Moreover, they are logically consistent with and complementary to the sole proximate cause defense. That is, if a defendant's conduct was not a proximate cause of the plaintiff's injury, it necessarily follows that the plaintiff's injury was only attributable to other causes and vice versa.[5] These concepts are inextricably connected. We presume the jury understood and followed the court's instructions. *Babikian v. Murz*, 2011 IL App (1st) 102579, ¶ 20.

---

[5]This assumes, of course, that the plaintiff did in fact suffer an injury. There was no dispute here that AJ was injured.

¶ 69        In addition, if Advocate was concerned that the jury would be confused by the instructions, it could have requested special interrogatories to make the jury specify what it found to be the cause of AJ's injury. For example, the jury could have been asked, "Did AJ's developmental disabilities result only from FGR?" and/or "Would AJ have the same developmental disabilities if he had been delivered an hour sooner?"

¶ 70        Further, like the closing argument in *Schultz*, Advocate's closing argument emphasized FGR as the exclusive cause of AJ's developmental disabilities and expressly argued he would have such disabilities even if he had been delivered sooner. To be sure, defense counsel's closing argument linked Advocate's sole proximate cause defense to IPI Civil No. 15.01: "From our perspective the last sentence is the controlling one and it wasn't read to you. 'However, if you decide that the defendant's conduct was not a proximate cause of the plaintiff's injury, then your verdict should be for the defendant.' That's my defense in this case." Counsel went on at length to explain:

> "They believe all of his permanent injuries are due to lack of oxygen 30 to 45 minutes before delivery. That's their case *** That's their causation.
>
> Our causation is obviously a little different. *** if AJ is born an hour earlier, what did that have to do with the severe fetal growth restriction that had been going on for weeks and likely months? Of course, nothing.
>
> * * *
>
> *** [I]f you believe that [only FGR is the cause], then you know whatever the nurses did ordidn't do, whatever the residents did or didn't do, *** is not the reason [AJ] has the problems he has today.
>
> * * *

*** [I]f AJ was born an hour before, 12 hours before, 24 hours before, he is going to have the very same outcome. *** [B]ecause of this underlying severe FGR ***.

* * *

This little boy[:] he was destined to have the very problems he has because of what went on in the seven weeks before birth."

Thus, counsel made it abundantly clear that Advocate contended AJ's developmental disabilities resulted only from FGR and that the timing of his delivery made no difference. In addition, counsel expressly urged this as the basis for the jury to find, in accordance with the instruction, that Advocate's conduct was not a proximate cause of AJ's disabilities and that the jury should return a verdict for Advocate.

¶ 71          We also observe that, over the course of a three-week trial, the parties made it clear to the jury that causation was a pivotal issue in the case. The bulk of the plaintiff's evidence was aimed at proving AJ's developmental disabilities resulted from oxygen deprivation before his delivery, even if FGR was a contributing factor. Advocate, on the other hand, spent the bulk of its defense attempting to prove AJ's developmental disabilities resulted from FGR and the timing of his delivery made no difference. It is not reasonable that the jury would have returned a verdict against Advocate if they believed that AJ's disabilities were caused solely by FGR. Significantly, the jurors found the residents and nurses liable but not Dr. Johnson. Those verdicts reveal the jury believed that oxygen deprivation caused AJ's disabilities. That is, they necessarily credited Dr. Johnson's testimony that she would have ordered an emergency delivery much sooner, avoiding the oxygen deprivation that occurred later, had she been given accurate information.

¶ 72          In arguing that it was prejudiced by the lack of a sole proximate cause instruction, Advocate merely repeats that it presented evidence tending to show that FGR was the sole proximate cause

of AJ's injury. Thus, Advocate has essentially asked us to presume serious prejudice. But we do not presume serious prejudice from faulty jury instructions. Instead, we will only reverse a judgment if the jury was clearly misled. *Schultz*, 201 Ill. 2d at 274. The record here does not demonstrate that the jury was clearly misled. A party is not entitled to a perfect trial, only a fair trial free of substantial prejudice. *Garest v. Booth*, 2014 IL App (1st) 121845, ¶ 48. We are not persuaded that Advocate did not receive a fair trial. Accordingly, we find that Advocate was not seriously prejudiced by the trial court's refusal to give the modified instruction it tendered.

¶ 73                                              F. Prejudgment Interest

Advocate challenges the trial court's award of prejudgment interest on two grounds. First, Advocate argues that the prejudgment interest statute, section 2-1303(c) of the Code, violates several provisions of the Illinois Constitution of 1970. These include the right to trial by jury (Ill. Const. 1970, art. 1, § 13), separation of powers (*id*. art. II, § 1), the prohibition on special legislation (*id*. art. IV, § 13), equal protection (*id*. art. I, § 2), due process (*id*.) and the three-readings requirement (*id*. art. IV, § 8(d)). This court has rejected constitutional challenges to the prejudgment interest statute in three published opinions. See *Cotton v. Coccaro*, 2023 IL App (1st) 220788, ¶¶ 40-70; *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶¶ 175-222; *Galich v. Advocate Health & Hospital Corp.*, 2024 IL App (1st) 230134, ¶¶ 57-85. The arguments Advocate asserts appear to be "cursory recitations" of the same arguments advanced and rejected in our prior opinions and, for that reason, do not merit our review. *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st) 230355, ¶ 119 (finding that cursory arguments reciting the same constitutional challenges to the prejudgment interest statute rejected in *Cotton* were forfeited).

¶ 74           Apart from its constitutional challenge, Advocate argues that the high-low arrangement it proposed before the jury announced its verdict bars the plaintiffs from recovering prejudgment

interest by operation of section 2-1303(c). Section 2-1303(c) provides that when a judgment is less than or equal to the amount of the highest written settlement offer made within the relevant time, prejudgment interest may not be added to the amount of the judgment. 735 ILCS 5/2-1303(c) (West 2022). However, if the judgment amount is greater than the highest written settlement offer, the plaintiffs are entitled to prejudgment interest on the difference between the judgment and the offer. *Id.* If no qualifying settlement offer was made, plaintiffs are entitled to prejudgment interest on the total amount of the judgment.[6] *Id.*

¶ 75        A written settlement offer must be made within 12 months of the filing of the action to qualify for any effect on the calculation of or elimination of prejudgment interest. *Id.* However, the statute allowed for settlement offers made within 12 months of the effective date of its enactment to also qualify. *Id.* That situation was implicated here. The statute took effect on July 1, 2021, and Advocate made its high-low proposal on June 24, 2022, just one week within the required period.

¶ 76        As before the trial court, Advocate contends that its high-low proposal was a written settlement offer and because the judgment amount of $20 million was equal to the proposed high number, section 2-1303(c) prohibits the award of prejudgment interest. The plaintiffs respond that a high-low proposal is not a settlement offer within the meaning of the statute. Or, even if a high-low proposal were considered a settlement offer, the proposal in this case lacked sufficient terms to constitute an offer that could be legally binding if accepted.[7]

---

[6]Section 2-1303(c) provides for the addition of prejudgment interest at the rate of 6% per annum in actions for personal injury or wrongful death. Prejudgment interest applies only to damages. Punitive damages, sanctions, statutory attorney fees, and statutory costs are excluded. 735 ILCS 5/2-1303(c) (West 2022).

[7]We note that plaintiffs also assert that the Advocate's high-low proposal was not in writing. Plaintiffs offer no argument, however, apart from their bare assertion. A party forfeits an argument when they fail to adequately develop it. *Village of Downers Grove v. Village Square III Condominium Ass'n*, 2022 IL App (2d) 210098, ¶ 47.

¶ 77        The trial court found that a high-low proposal was not a settlement offer for purposes of section 2-1303(c), reasoning that such agreements do not terminate litigation before a trial and that a defendant could easily undermine the statute with a bad faith high-low offer. The trial court's finding involved the interpretation of a statute and a conclusion of law. These both implicate *de novo* review. *Storino, Ramello & Durkin v. Rackow*, 2015 IL App (1st) 142961, ¶ 27 ("We review the trial court's conclusion of law *de novo*."); *In re Application of the County Collector*, 2022 IL 126929, ¶ 19 ("When an issue requires this court to construe or interpret the relevant statute, we conduct that review *de novo*.").

¶ 78        When interpreting a statute, our primary objective is to ascertain and give effect to the legislature's intent. *In re Application of County Collector*, 2022 IL 126929, ¶ 19. The best evidence of legislative intent is the language of the statute, which should be given its plain and ordinary meaning. *Id.* Undefined terms in a statute shall be given their ordinary and popularly understood meanings. *People v. Ward*, 215 Ill. 2d 317, 325 (2005).

¶ 79        Advocate points out that this court has recognized a high-low agreement as a settlement agreement in *Pinske v. Allstate Property & Casualty Insurance Co.*, 2015 IL App (1st) 150537, ¶¶ 22, 24, and that Black's Law Dictionary also defines a high-low agreement as a kind of settlement agreement (Black's Law Dictionary (12th ed. 2024)). But the question before us is not whether a high-low agreement can be categorized as a settlement. Our inquiry is to ascertain the legislature's intent when it refers to a "settlement offer" in the prejudgment interest statute.

¶ 80        "Settlement" is not defined in section 2-1303 or elsewhere in the Code, so we look to the term's ordinary and popularly understood meaning. *Ward*, 215 Ill. 2d at 325. We observe that "settlement" is the nominalization of the verb "settle." The words "settle" and "settlement" suggest finality. When used in relation to a lawsuit, the ordinary use of these words connotes conclusive

resolution of the suit by agreement. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/settle (last visited Apr. 30, 2025) [https://perma.cc/KC27-XL4T] (definitions of "settle" include "to fix or resolve conclusively" and "to conclude (a lawsuit) by agreement between parties usually out of court"); American Heritage Dictionary 1182 (2d ed. 1982) (definitions of "settle" include "To decide (a lawsuit) by mutual agreement of the involved parties without court action."); Black's Law Dictionary 1377 (7th ed. 1999) (definition of "settlement" includes "An agreement ending a lawsuit.").

¶ 81    Further, in determining legislative intent, we may consider the reason and necessity for the law, the problems sought to be remedied, the purpose to be achieved, and the consequences of construing the statute one way or another. *In re Application of County Collector*, 2022 IL 126929, ¶ 19. In *Cotton*, this court discussed the justifications for awarding prejudgment interest:

> "The rationale for prejudgment interest is multifold. The prejudgment interest award complements the compensatory purpose of civil law by ensuring that the plaintiff is compensated not just for the actual injury but also for the delay in being made whole. *** Conversely, it also ensures that a defendant is not unjustly enriched during that delay by retaining funds due to the plaintiff without cost: a defendant bears the full cost of his conduct." *Cotton*, 2023 IL App (1st) 220788, ¶ 43.

We further observed:

> "Prejudgment interest also promotes efficiency in the processing of legal claims because it reduces a defendant's incentive to delay resolution of a case. *** That delay not only burdens the court system by crowding dockets, but it also compromises the quality of justice since evidence degrades or is lost over time (a hardship falling disproportionately on the party with the burden of proof)." *Id.* ¶ 44.

¶ 82    This case also calls for us to consider how the statute treats settlement offers. As we noted, the statute provides for the potential reduction or elimination of prejudgment interest depending on a comparison between the judgment amount and the highest written settlement offer made within the specified time. Such a settlement offer, so long as it would conclude the case, presents an opportunity to reduce the cost of the delay in making the plaintiff whole. At a trial, the finder of fact determines the amount the plaintiff has been damaged. So, when a judgment is less than or equal to a rejected settlement offer, we infer the defendant was not responsible for the delay, as the defendant was willing to pay what the plaintiff was determined to be owed or more. The plaintiff could have avoided the delay by accepting the settlement offer. Thus, the justification for prejudgment interest disappears. Section 2-1303(c) accords with this reasoning by providing that no prejudgment interest may be added in this situation. By contrast, a settlement offer only partially offsets the amount of prejudgment interest when the judgment is greater than a rejected settlement offer. In that situation, we can reason that the defendant still occasioned delay since its offer was less than what was determined to be the amount the plaintiff was rightfully owed. Thus, section 2-1303(c) was designed to both encourage "prompt settlement of a meritorious claim" and to provide "an offset for a good faith settlement offer made by the defendant." 102d Ill. Gen. Assem., Senate Proceedings, Mar. 25, 2021, at 27-28 (statements of Senator Harmon). When the legislation was discussed in the General Assembly, the sponsor clarified that prejudgment interest would not apply to settlements, which were described as "anything that doesn't go to a verdict." *Id.* at 32.

¶ 83    Considering the ordinary and popularly understood meaning of "settlement," along with other indicia of legislative intent, we believe that the legislature's use of the words "settlement offer" in section 2-1303(c) intended only to refer to settlement offers that would result in a final resolution of the claim without going to trial—in other words, a full settlement.

¶ 84    While we agree with *Pinske* and other authorities that a high-low agreement is a settlement agreement, it is not the *kind* of settlement contemplated in the prejudgment interest statute. Rather, it is " 'a conditional settlement.' " *Pinske*, 2015 IL App (1st) 150537, ¶ 23 (quoting *Cunha v. Shapiro*, 837 N.Y.S.2d 160, 163 (App. Div. 2007)).

> " 'The condition of the agreement is that the jury render a verdict that falls outside the range of the high-low agreement. When a verdict is rendered outside of the agreed-upon range, the condition is triggered and the 'high' or the 'low' becomes binding upon the parties as a settlement. By contrast, when a jury renders a verdict within the range of the high-low agreement, the condition is not met and the high-low agreement is rendered academic.' " *Id.* (quoting *Cunha*, 837 N.Y.S.2d at 163).

Accordingly, a high-low agreement still requires that a case proceed to trial and a verdict be reached. The arrangement cannot reduce the cost of delay or the burden on court dockets, which the legislature sought to alleviate with the prejudgment interest statute. Thus, we conclude the legislature did not intend for a high-low proposal to qualify as a settlement offer for purposes of the prejudgment interest statute.

¶ 85    For these reasons, we find that Advocate's high-low proposal was not a settlement offer within the meaning of section 2-1303(c) and had no effect on the plaintiffs' right to prejudgment interest.

¶ 86                                III. CONCLUSION

¶ 87    Based on the foregoing, we affirm the judgment of the circuit court.

¶ 88    Affirmed.

*Johnson v. Advocate Health & Hospitals Corp.*, **2025 IL App (1st) 230087**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-L-12407; the Hon. Janet Adams Brosnahan, Judge, presiding. |
| **Attorneys for Appellant:** | David C. Hall, Hugh C. Griffin, Sabina Babel, and Molly E. Pankauskas, of Hall Prangle & Schoonveld, LLC, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Michael W. Rathsack, of Park Ridge, for appellees. |
| *Amicus Curiae*: | Robert E. Elworth, of Swanson, Martin, & Bell, LLP, of Chicago, for *amicus curiae* Illinois Defense Counsel. |